## R. V. Field, Appellee, v. S. A. Ingersoll, Appellant.
### Gen. No. 7,176.

1. BROKERS—*right to commissions from both parties.* A real estate broker is entitled to recover commissions from defendant for negotiating an exchange of defendant's Montana lands for lands in Illinois, notwithstanding the payment of a commission to him by the other party, where the evidence shows that the broker was first called upon by defendant to assist in negotiating the exchange under circumstances which imply a promise of compensation for his services and that thereafter the other party sought to employ the broker to close the deal which employment was declined until defendant's approval could be secured, that defendant thereafter approved of the double employment with knowledge of the facts and discussed the matter of compensation with the broker and promised to pay him with knowledge of the amount to be paid by the other party and that defendant accepted the broker's services which resulted in the consummation of the exchange.

2. BROKERS—*evidence of double employment.* The fact that a real estate broker when called upon by defendant for services in negotiating a trade of lands first discouraged the deal and afterwards approved of it does not show that he was employed exclusively by the other party to the exchange and not by defendant, where the evidence shows that the broker's approval was given after he was informed that defendant intended to expend a large sum of money in improving the land if he made the exchange, especially where the broker accepted employment from the other party only after he had fully disclosed the facts to defendant and secured the latter's approval and where the broker is shown to have dealt fairly throughout the entire transaction.

3. BROKERS—*amount of commissions.* In a broker's action for commissions for negotiating an exchange of defendant's Montana lands for more valuable Illinois lands, a verdict for $1,843 is sus-

tained by the evidence which shows that it was customary for the broker to receive 2 per cent commission on the value of the more valuable of the two tracts, that the Illinois lands were worth in excess of $300,000 and that the broker was entitled to receive commissions from both parties and had received $4,000 from the other party to the exchange.

4. BROKERS—*evidence in action for commissions.* In a broker's action for commissions where the fact of employment is disputed under the claim that plaintiff was employed by the other party to the exchange and compensated by him, writings made by the broker in the presence of defendant, who employed him, containing lists and values of personal property to be included by defendant in the exchange of properties, which were the basis upon which the exchange was consummated after submission of such lists to the other party and his refusal to make the exchange unless the property shown thereon was included, are admissible in evidence.

5. HARMLESS AND PREJUDICIAL ERROR—*invited error in argument of counsel not prejudicial.* In a broker's action for commissions for negotiating an exchange of real property for defendant, it is not error for the trial court to overrule an objection to argument of plaintiff's counsel referring to defendant's wealth and acquisitiveness and comparing the parties in that respect, where the remarks in question were made in reply to argument of defendant's counsel which was objectionable in the same particulars.

Appeal by defendant from the Circuit Court of Knox county; the Hon. WALTER C. FRANK, Judge, presiding. Heard in this court at the October term, 1922. Affirmed. Opinion filed March 16, 1923.

CARNEY, CARNEY & NELSON and HARDY & HARDY, for appellant.

MARSH & RICE and WILLIAMS, LAWRENCE, GREEN & GALE, for appellee.

MR. JUSTICE PARTLOW delivered the opinion of the court.

Appellee, R. V. Field, began suit in the circuit court of Knox county against appellant, S. A. Ingersoll, to recover $4,000 alleged to be due as a commission for services performed in the exchange of real estate between appellant and W. C. Gunn. There was a trial by jury, verdict for the appellee for $1,843.58, and

from the judgment rendered upon the verdict this appeal was prosecuted.

Appellee was a real estate agent and lived in Galesburg. Appellant also lived in Galesburg and was in the steel business, manufacturing discs and other farm implements. He was the owner of about 5,920 acres of land in Montana. Gunn lived in Fort Scott, Kansas, and was the owner of about 2,336 acres of bottom land in Brown and Pike counties, Illinois. On June 24, 1920, appellant and Gunn exchanged lands. The written contract provided that appellant was to pay $70,000 difference between the values of the land exchanged and was to transfer to Gunn certain machinery, tools, a Ford car, ten head of horses, all harness and one stallion, which were on the Montana lands. Gunn was to assume certain taxes and assessments on the Illinois land and was to assign to appellant a certain contract for clearing part of the Illinois land. Later on another written contract was entered into between appellant and Gunn by the terms of which 484 acres of the Pike county land were eliminated from the original contract and in lieu thereof 320 acres of Pike county land were substituted. Appellant agreed, in addition to the personal property mentioned in the original contract, to give Gunn ten horses and five mules. It is over the exchange of this land that appellee claims a commission.

As grounds for reversal, it is urged that appellee was not employed by appellant in the trade, but he was employed by Gunn, who paid him $4,000 for his services; that the services of appellee were not reasonably worth $8,000, or any other sum in excess of $4,000, and appellant was not indebted to appellee in any sum.

The declaration consists of a special count, alleging indebtedness for services rendered in trading the land, and to this special count a common count was added. The affidavit of appellee's claim sets out that the de-

mand of appellee was for a commission as a broker, or agent, for the appellant and there was due $4,000. The appellant filed the general issues and an affidavit of meritorious defense, and later an additional affidavit was filed, in which it was alleged that appellee was not employed by appellant, but was in the employ of Gunn and had been paid $4,000 for his services, which were not worth to exceed $4,000.

The evidence shows that early in February, 1920, negotiations were entered into between Gunn and appellant for the exchange of these lands. Gunn was assisted by his agent, John Connor. Appellant and Connor paid a visit to the land. Appellee had been a real estate agent for about fifteen years and had done some business for appellant. Late in February appellant called appellee over the telephone and talked to him relative to this trade. The same day appellee went to appellant's office with a blue print of the Illinois land and in the presence of R. C. Ingersoll, a son of the appellant, the blue print was examined and the trade was discussed. Appellee was not very favorable to the trade and told appellant of certain things which he thought should be taken into consideration before the trade was made, namely, the sufficiency of the levees and the danger of their breaking, the flowing of waters from the hills, the difficulty in keeping up the roads in the low lands, the levee taxes, and the insufficiency of the pumping plant which protected the Illinois lands from overflow. Appellant replied that he had been over the land twice and liked it pretty well. He said his son, Harold, had been running the Montana ranch, but was coming home to go into the steel business, and he would like to get rid of the Montana ranch but could not sell it to any great advantage at that time and would like to trade it. As appellee started to leave appellant's office, he met Gunn and Connor at the door. Appellant introduced appellee to them and said appellee was a real estate man

he was taking down with him to look over the land. Gunn replied that they would never get the deal through if there was a real estate man in it.

Appellee had never seen the Illinois land. About March 1, Connor, appellee, appellant and his two sons, Roy and Harold, went to inspect the Illinois land. They went all over it, inspecting the roads, levees and the character of the soil. While they were examining the land, Connor had a conversation with appellee in which he told appellee that if he could conscientiously do so, they would like to have him recommend the land to appellant. Nothing further was said at that time on that subject and the party returned to Galesburg. Shortly afterwards Connor had another conversation with appellee in which he asked him if he had made up his mind to represent Gunn in the trade and offered appellee $2,000 commission for so doing. Appellee replied that if he came into the deal he wanted to come in open and above board and he could not agree to come until after he had discussed the matter with appellant. Appellee testified that on Sunday following this conversation with Connor, he saw appellant in the vestibule of the Central Church and told appellant Connor had come to him and told him there was no man in the deal representing them and had asked appellee to come into the deal and represent them. He told appellant he had stated to Connor he was representing the appellant and would not go into the deal unless both sides agreed, and the appellant told him it would be satisfactory with him to go ahead. Appellant testified he had no such conversation with appellee at the church, but appellee came to his office and said Connor wanted to employ him to help put the deal over; that there had been a split in the deal and they needed help but he did not want to go into the deal if there was any objection to it, and if appellant had any objection, he would not go into the deal. Appellant replied that he did not care who they got

into the deal; that they could not put it over on the basis they had been trying to and it made no difference to him whom they got in the deal.

After this alleged conversation appellee continued in the deal until it was closed. In one of the conversations between appellant and appellee, appellee testified that he told appellant that if he expected to sell the bottom lands at the price Gunn was asking not to make the deal. Appellant replied he expected to keep the land for five years and develop it and spend $50,000 in so doing. Appellee testified he told appellant that if he kept the land and developed it as suggested, it would make it one of the best pieces of land in Illinois; and in that conversation, appellant said: "Those fellows are too high in their price, see if you can get them to come lower in price." Later on, another trip was made to the land, in the latter part of May or the first part of June, shortly after appellee had informed appellant that Connor wanted him to assist in the deal. Appellant claims this trip was arranged by appellee and when appellee suggested that they make another visit to the land, he replied that he was willing to go because he wanted to see how the land had dried off since the earlier trip. Upon this second trip, appellant testified appellee pointed out different pieces of land and said. "That piece looks like $200 an acre land to me and I believe you can dispose of considerable of this land." After a number of conversations, appellant, appellee, Connor, Gunn, Roy Ingersoll and Harold Ingersoll met at the Galesburg Club, where the matter was fully gone over and propositions made back and forth as a basis for trading. These propositions on each side, the value to be placed on the various tracts of land and other property included in the trade were put down on a piece of paper by appellee and the paper was afterwards introduced in evidence as exhibit 2. The parties did not arrive at a conclusion at this meeting at

the Galesburg Club, and, after this meeting, appellee went to appellant's office and told him there was only about $33,000 between them and the deal amounted to almost a half million dollars, and urged the appellant to put in certain articles of property, the horses, harness and the machinery on the Montana ranch, which appellant finally consented to do. These articles and their value were placed partly on exhibit No. 2 and a part of them were put on another sheet of paper, which was introduced in evidence as exhibit No. 3. Appellee testified that after they had marked these various articles down on paper with their values, appellant asked appellee to take those two exhibits to Gunn and Connor; that he did take these exhibits to Gunn and Connor and they were fully examined. This conversation between Gunn, Connor and appellee took place at the Arlington Hotel, and appellee told Gunn and Connor that appellant had done the very best he could do and would do no more. The next morning Connor and appellee went to see appellant and asked him to put in some more horses in the trade, which appellant finally consented to do and on June 24 the contract was finally signed. Later on the question arose relative to the substitution of 320 acres for 480 acres which were in the original contract. For the purpose of inspecting this land, appellee, appellant, Gunn and Connor again went to the land and it was finally agreed that the contract should be modified as above stated. Appellee testified that on the return trip, as they were getting back into Galesburg, appellant came and sat down beside him and asked how much he owed him. Appellee replied he could not tell at that time as he had not made arrangements with Gunn as to the commission and as soon as he made arrangements with Gunn, he would let appellant know. As to this conversation, appellant testified he did not ask appellee how much he owed him and appellee did not then, or at any other time, tell him that as soon

as he arranged his commission with Gunn he would let him know, but he did testify that he asked appellee where he expected to get his pay for all the work he was doing and appellee replied that he expected to get his commission from Gunn, and appellant said, "I thought that if you did not get a fair commission, I would not mind adding something to it."

Appellee testified he agreed with Gunn upon the commission and afterwards told appellant he had agreed on a commission of $4,000, and stated to appellant that he would like to know what appellant was going to pay. Appellant testified appellee never referred to the matter of commission until just before the final papers were signed, when appellee told him .he was to get $4,000 from Gunn and asked appellant to see that he got this before the papers were finally passed; that appellee never at any time asked for any money until after the deeds were delivered; that appellee told him he had only gotten $1,500 out of the deal and some worthless notes and he asked appellant to cash these notes; that in June, appellee came to his office and for the first time made a demand for a commission of 2 per cent on $450,000 and said Gunn had paid him $4,000 and he was expecting a like sum from the appellant. There was evidence in the case that it was customary among real estate agents, where the agent represented both parties, to receive a commission of 2 per cent of the value of the more valuable piece of property traded. Appellant claimed he never put any price on either his land or on the Illinois land, and there was no agreement as to the price. There are many other facts, circumstances and conversations which appear in the evidence which each party claims have vital bearing on the case, but we have recited the principal facts and all of them which we deem necessary for the determination of the questions at issue.

As a general rule a real estate agent will not be per-

mitted to be the agent for both parties and collect a fee from both. Such employment is not looked upon with favor by the courts upon the theory that the agent cannot serve two masters at the same time. *Bunn v. Keach,* 214 Ill. 259; *Kronenberger v. Fricke,* 22 Ill. App. 550; *Boyd v. Dullaghan,* 33 Ill. App. 266; *Welch v. Garrett Biblical Institute,* 186 Ill. App. 191. But there is a well-known exception to this rule which has been recognized by the courts, which is that a real estate agent may be the agent of both parties and collect fees from both where the agent is employed by both parties with the full knowledge and consent of each and acts in good faith and there is no fraud in the transaction, under which circumstances he may collect a fee from both parties. *Larson v. Schamberg,* 148 Ill. App. 80; *Johnson v. Kurzenknabe,* 182 Ill. App. 459; *Egeland v. Scheffler,* 189 Ill. App. 426; *Madden v. Davis,* 192 Ill. App. 575; *Goldstein v. Setka,* 195 Ill. App. 584. The law does not specify or require any specific form or contract of employment where the real estate agent sells or trades a piece of property for the owner. The contract may be specific, and may be either oral or in writing, or it may be established by the acts of the parties. Where the owner of land desires to sell or trade it, and calls into the deal a real estate agent who performs valuable services resulting in the sale or exchange, the facts presented may be sufficient to establish an agency and render the owner liable for a fee. *Purgett v. Weinrank,* 219 Ill. App. 28. In *Fox v. Ryan,* 240 Ill. 391, it was said: "Where a broker is employed to sell property by the owner, if he procures a purchaser within the time limited by his authority who is ready, willing and able to purchase the property upon the terms proposed by the seller, he is entitled to his commissions." The same rule applied when land is traded and not sold. When the evidence is in conflict as to whether there was an employment, or whether services were performed

which resulted in a contract, it becomes a question of fact for the jury to say whether there was an employment, and whether the acts performed by the agent were sufficient to entitle him to a commission. *McKey v. Ester,* 157 Ill. App. 168; *Wickert v. Crosthwait,* 163 Ill. App. 586; *Greenwald v. Weinberg,* 174 Ill. App. 439. Where the evidence is in conflict, the courts will not disturb the verdict unless it is clearly against the weight of the evidence. *Eggmann v. Nutter,* 169 Ill. App. 116; *Schneeweisz v. Illinois Cent. R. Co.,* 196 Ill. App. 248. When there is a conflict in the evidence as to the knowledge of the principal that his agent was also acting as the agent of the other party, the question is one of fact for the jury and the verdict will not be disturbed unless it is clearly contrary to the evidence. *Jones v. Veeck,* 197 Ill. App. 119.

In this case negotiations were first entered into between Gunn, Connor and appellant. Within a few days after they were opened, appellee was called into the trade by appellant and visited appellant's office and later made a trip to the land. When on this trip the dual agency was suggested by Connor for the first time. It must be assumed from appellee's answer to this proposition of Connor that he considers he had been employed by appellant and was under obligation to him and could not take employment from Gunn unless appellant knew of it and consented. If he had not considered he had been employed by appellant, he would have been at liberty to accept employment from Gunn without consulting appellant, but the evidence clearly shows he refused to accept the employment until he talked with appellant. It is undisputed that there was a conversation between appellant and appellee on this subject. Just what was said in this conversation is in dispute, but it is admitted by the appellant that appellee told him that Connor had asked him to come into the deal, and the testimony of the appellant shows he knew from that time on appellee

was in the deal and was representing Gunn. There is no evidence that the appellant ever told appellee he did not want appellee to represent him, but with full knowledge of the conversation with Connor, appellant continued to accept valuable services from the appellee. From all these facts and circumstances it cannot be successfully claimed by appellant that he did not know appellee was in the deal in the interest of Gunn. Neither do we think it possible for the appellant to successfully claim appellee was not in the employ of the appellant. The appellant called appellee into the deal. Even before the trade was closed there was some talk between appellant and appellee relative to the payment of commission, in which appellant indicated a willingness to at least help appellee out, provided appellee did not get enough commission from Gunn. We think these conversations, when considered as a whole, were an admission on the part of appellant that he was liable for a commission of some kind and was willing to pay it. To say the least, the evidence on this point was in such conflict and it became a question of fact for the jury to determine whether or not there was double employment. The jury found there was a double employment and we will not disturb that finding, unless we can say it is against the weight of the evidence, which we do not feel justified in doing.

Appellant contends that when he first talked to appellee about the trade and after they had made the first visit to the land, appellee discouraged appellant about the trade and advised him not to make it, but upon the second visit, after appellee had been employed by Gunn, appellee changed his attitude, began to advise that the trade be made and pointed out some land which he said could be sold for $200 an acre; that these acts indicated an employment by Gunn and not by appellant. We do not think this contention is sustained by the evidence, or, even if it was sustained, it is not controlling in the case. Roy Ingersoll testified

that, upon the first visit to the land before there had been any talk about a double employment, appellee pointed out certain tracts of land and said he thought they could be sold for $200 an acre. It is true a similar remark was made by appellee upon the second visit, but the first remark was made before there had been any suggestion of an employment by Gunn and several days before there was an actual employment. In the light of this evidence, the force of appellant's contention is very much weakened. The evidence shows appellee at first advised against making the trade, but he claims he did so before he knew of the appellant's intention to spend $50,000 in improving the land. He testified that after he had been informed of this intention, he did say he thought it would be a good trade and advised appellant to make it. After he had been employed by both parties with their full knowledge and consent, it was to his interest to complete the trade if he could do so, and it is not of much moment that, after such double employment, he changed his attitude and did what he could to complete the deal. He was employed by both for that purpose, and after such employment occupied a different position from the one which he had occupied when he was only in the employ of the appellant.

The second ground urged for reversal is that the $4,000 which the appellee received from Gunn was in excess of 2 per cent of the market value of the Illinois land, which was the more valuable of the two tracts. The value of both tracts appears in the evidence. Appellant offered evidence tending to show that the Illinois land was worth $195,000. This amount was ascertained by averaging the testimony of the various witnesses. The evidence on behalf of the appellee showed its value was from $286,000 to $325,000, or an average of more than $300,000. The Montana ranch was taken at a value of $364,000, which together with the $70,000 assumed by appellant, brought the value

of that land up to $434,000. Appellee received $4,000 commission from Gunn and claimed a like amount from appellant. The jury gave him $1,843.58. There is evidence upon which to base a commission of this amount and we do not feel justified in disturbing the verdict.

Complaint is made that the court improperly admitted in evidence appellee's exhibits 2 and 3. Exhibit 2 was a list of the property made at the Galesburg Club, when all of the parties were present, and exhibit 3 was the value of additional property which was to be put in by appellant, in order to complete the trade. The evidence shows that both of these exhibits not only were made by appellee in the presence of appellant, but they were afterwards submitted to Gunn and Connor, examined by them, and were the basis of the settlement. For this reason the court was not in error to admit them.

In the argument counsel for appellee said: "There was nothing the matter with Ralph Field's throat. He did not have a fish bone in it. He had tasted the $4,000 which he received from Gunn and it tasted so good to him he is trying to get that much more out of the defendant here." He later said: "Field ought to have a double cross made for him of solid brass for coming into court with this case; and now he is asking this jury, by some strong, strange alchemy, to change that cross into a cross of gold, which he may collect from this defendant." In reply to those remarks, counsel for appellee said: "Mr. Carney said to you that Mr. Field swallowed $4,000 and it tasted so good to him that he is trying to get another bite. I say to you, gentlemen, that $4,000 would not be seasoning for a bite for Mr. Ingersoll. Mr. Ingersoll knew where he could get $70,000 in cash, or he would not have signed this contract. He is a business man." Counsel for appellant objected to this last remark and the court ruled that counsel for appellant had opened

the matter up and counsel for appellee could make any deduction he wished to make from the remark. Appellant contends the first statement was in response to some prior statement by counsel for appellee, but such prior statement, if there was one, has not been called to our attention. Appellant contends the last statement was erroneous and its only object was to prejudice the jury. A party can have no just ground for complaint on account of remarks improper in themselves, which have been necessitated by like remarks on the other side. When the attorney for the losing party is the aggressor in matters of this kind, thereby challenging reply from his opponent, the court will not punish the prevailing party by granting a new trial for indiscretions committed by his counsel, unless it clearly appears that the verdict is improperly influenced by such statement. 2 Encyc. Pleading and Practice, 731-733. When remarks of counsel with reference to the wealth of a party to the suit are in line with the evidence, it is not prejudicial. *Commonwealth Elec. Co. v. Rose,* 214 Ill. 545; *Gibson v. Fidelity & Casualty Co.,* 232 Ill. 49. We think the record shows the last remark made by counsel for appellee was in response to a remark by counsel for the appellant and the court committed no error in overruling the objection to it.

Appellant insists that the third, fourth and seventh instructions refused on behalf of the appellant should have been given. The third instruction was on the question of the double employment of the appellee and was fully covered by the fifteenth instruction given on behalf of the appellant, and we think the fourth and seventh instructions were properly refused.

We find no reversible error and judgment will be affirmed.

*Judgment affirmed.*