ROBERT ZWIKEL, Plaintiff-Appellant, *v.* W. F. HALL PRINTING COMPANY, Defendant-Appellee.

(No. 55292;

· First District—September 14, 1972.

Richard G. Finn and Thomas R. Challos, Jr., both of Chicago, for appellant.

Max Wildman, Stewart S. Dixon, and John J. Arado, all of Wildman, Harrold, Allen & Dixon, of Chicago, for appellee.

Mr. PRESIDING JUSTICE McGLOON delivered the opinion of the court:

The plaintiff, a licensed real-estate broker specializing in industrial property, brought suit against the defendant for a real-estate brokerage commission allegedly due him arising out of a transaction in which the defendant purchased surplus property from the United States government. After a jury trial in which the verdict was returned for the defendant, the plaintiff moved for judgment notwithstanding the verdict or, in the alternative, a new trial. Both motions were denied by the trial judge, and judgment was entered for the defendant. In this appeal the plaintiff argues that under the evidence he was entitled to judgment notwithstanding the verdict or, in the alternative, that the prejudicial misconduct of counsel for the defense requires a new trial. The defendant argues that the evidence warranted the denial of both motions.

We affirm.

The evidence adduced at trial is as follows: In October, 1963, the plaintiff was informed by a third party that the defendant would be in need of warehousing facilities as of December, 1964. On the basis of this information, the plaintiff contacted a Mr. Ross, the warehousing manager of defendant, and together they inspected a number of industrial sites, among these a facility known as the Chicago Ordnance Plant. Ross was impressed with the plant and informed Mr. Knox, the president of defendant corporation, of the size, location and facilities of the building.

Knox arranged a meeting with the plaintiff in November, 1963, at which time the Chicago Ordnance Plant was discussed. The plaintiff testified that at this meeting he told Knox that he was a real-estate broker and that since the Chicago Ordnance Plant was owned by the United States Government which would not pay brokerage commissions upon the sale of this real estate, if defendant bought the plant the plaintiff would expect the defendant to pay him the usual brokerage commission. Knox admits that the plaintiff identified himself as a real estate broker but denied that the plaintiff mentioned anything about commissions.

On three occasions from December, 1963, to January, 1964, the plaintiff arranged a tour of the plant for Knox and a number of employees and associates of defendant. On these occasions the plaintiff would make

arrangements with the General Services Administration for the inspection tours. During this period Knox began to make inquiries regarding the possibility of additional railroad facilities for the plant in the event that defendant purchased or leased it.

In January, 1964, the plaintiff was informed that the General Services Administration would offer the Chicago Ordnance Plant for sale through the use of sealed bids on May 8, 1964. Plaintiff relayed this information to Knox and also informed Knox as to his estimate of the value of the real estate and his estimate of the minimum acceptable bid. On February 24, 1964, Knox and the plaintiff met to discuss improvement of rail facilities to the plant. The plaintiff testified that during this meeting he again informed Knox that if the Chicago Ordnance Plant was purchased by the defendant, he expected a 5 per cent commission payable by the defendant. Knox denied that any conversation regarding commissions took place during this meeting. On cross-examination the plaintiff admitted that it was the custom in Chicago for the seller to pay brokerage commissions and, although not prohibited, it was not customary for the purchaser of real estate to pay the commission.

Knox testified that the first time the subject of commissions arose was at a meeting with the plaintiff that took place on April 7, 1964. A day or two prior to this meeting Knox received a letter from the General Services Administration asking defendant to bid on the plant on May 8 and enclosing the forms needed to complete a bid. Knox testified that in light of the fact that the G.S.A. had communicated directly with him requesting his bid on the real estate, he became curious as to who would pay the plaintiff's commission. Knox testified that throughout the relationship he had assumed that plaintiff represented the seller, as was the custom in real estate sales.

Knox testified that on April 7, in response to his question, the plaintiff for the first time informed Knox that the brokerage commission would come from the defendant if it purchased the plant. Knox then informed the plaintiff that the matter was immaterial, since defendant did not plan to bid on the plant.

Defendant, in fact, did not bid on the plant, and the other bids that were submitted on May 8 were determined by the G.S.A. to be too low, and all bids were rejected.

On May 20, 1964, the defendant's interest in the Chicago Ordnance Plant was suddenly rekindled. On that date defendant was given the opportunity to acquire the contract to print approximately 50 per cent of Reader's Digest Magazine. This fact, Knox testified, caused cancellation of defendant's plan to build a second plant to its own specifications and made it necessary for defendant to purchase immediately the Chi-

cago Ordnance Plant. Knox, without contacting the plaintiff, reestablished direct contact with the G.S.A. and owners of real estate adjoining the Chicago Ordnance Plant. Plaintiff became aware of the defendant's new interest in the plant and called Knox, but Knox refused to discuss the plans of the defendant.

Shortly thereafter, in June, 1964, Knox called his attorney to arrange a meeting between the plaintiff and the attorneys for defendant at which time the plaintiff was told by the attorneys that he was not defendant's broker and that they did not want him to act as defendant's broker. Plaintiff immediately protested to both the attorneys and later to Knox claiming he was, in fact, the real-estate broker for defendant in this transaction.

Knox continued his direct negotiation with the General Services Administration, and in August, 1964, through a combination of price negotiation and sealed bid purchased the Chicago Ordnance Plant for $2,375,000. Subsequently, plaintiff presented to defendant a bill for $119,250 in accordance with the regulations of the Chicago Real Estate Board. Defendant refused payment but offered plaintiff $5,000 for his services and to avoid the possibility of a lawsuit. The plaintiff refused and commenced court action.

Sometime after the filing of the lawsuit but before it came to trial the original attorney whom plaintiff had retained withdrew from the case, and plaintiff acquired a second attorney to represent him at the trial and now in this appeal. The reason for Mr. Burton's withdrawal from the case is not clear, but his position as plaintiff's attorney and counselor was a matter that was admitted into evidence. Plaintiff testified that he did not have an attorney during the period of October, 1963, through June, 1964, but that he did talk to Burton on a number of occasions during November and December, 1963. Plaintiff was not questioned as to what he discussed with Burton, but it was admitted by Burton in an affidavit submitted in support of plaintiff's post-trial motion that plaintiff's business with defendant was discussed during these November and December conferences. This evidence was apparently elicited by the defendant in support of its inference that plaintiff had been discussing his possible claim for brokerage commission before defendant was informed that it was expected to pay the commission.

■■ Plaintiff first argues that the trial judge erroneously denied his motion for judgment notwithstanding the verdict. In a review of this issue we are not called upon to substitute our judgment for that of the jury. We are only to determine whether all of the evidence, when reviewed in its aspect most favorable to the defendant, so overwhelmingly favored the plaintiff that no contrary verdict based thereon could ever

stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill.2d 494, 510, 229 N.E.2d 504; *Hamas v. Payne* (1969), 107 Ill.App.2d 316, 246 N.E.2d 1; *Neubauer v. Coca Cola Bottling Co. of Chicago* (1968), 96 Ill.App.2d 18, 238 N.E.2d 437.) We cannot say that such is the case.

■■■ Viewing the evidence in its aspects most favorable to the defendant, we find that prior to April 7, 1964, the defendant was not aware that the plaintiff was acting as its broker. No implied contract to pay compensation had arisen because the defendant did not know that the plaintiff expected compensation from it if a sale was consummated, nor was the plaintiff led to believe he would receive compensation from defendant. (*Knotts v. Lake Shore & Michigan Ry. Co.* (1912), 172 Ill. App. 550.) After April 7, 1964, when the defendant again became interested in the purchase of the Chicago Ordnance Plant, defendant made no request for plaintiff's services and quickly rebuffed the plaintiff's attempt to establish any compensable relationship. The evidence viewed in this light certainly does not so overwhelmingly favor plaintiff that no contrary verdict would ever stand. *Pedrick, supra.*

Plaintiff next argues that misconduct of counsel for the defense was so prejudicial as to require a new trial. Plaintiff alleges misconduct occurred on three occasions: in the opening statement when defense counsel stated that plaintiff's numerous conferences with his attorneys "Burton and Isaacs * * * shows that they were from that day forward fabricating a claim"; during the defense cross-examination of plaintiff when through a series of questions defense counsel inferred that there was some undisclosed motive for plaintiff's termination of membership in the Chicago Real Estate Board; and in the defense closing argument when defense counsel asked the jury to put themselves in the place of the defendant and again when defense counsel, referring to the real estate business, stated: "It is a fine business, but sometimes people cast discredit upon it just as some lawyers sometimes cast discredit upon the legal profession."

The cases that plaintiff cites to support his argument for a new trial are not persuasive. Those cases cited for the proposition that it is reversible error to ask the jury to put themselves in the position of the defendant are personal injury actions in which counsel asked the jury to put themselves in the position of the injured plaintiff, a situation in which distortions of fair judgment by reason of appeal to passion and prejudice are clearly more evident than would be in the instant case. The other cases cited by plaintiff are personal injury actions in which counsel impugned the veracity or ridiculed opposing trial counsel, liberally commented on facts not in evidence, or cases in which repeated instances of improper questioning and improper argument caused re-

versal. These cases are either distinguishable for obvious reasons or instances of misconduct of a much more serious degree than occurred in the instant case.

■■ The decision of the trial judge on a motion for a new trial will not be reversed except for a clear abuse of discretion, which must affirmatively appear in the record. The trial judge has an advantage over a court of review in that he or she has an opportunity to observe firsthand the conduct of the trial, the demeanor of witnesses and counsel, the reaction of jurors to evidence and argument and the effect upon them of incidents that occur during the trial. *Potter, Admr. v. Ace Auto Parts* (1964), 49 Ill.App.2d 354, 199 N.E.2d 618; *Lukich v. Angeli* (1961), 31 Ill.App.2d 20, 175 N.E.2d 796.

■■ We have thoroughly reviewed the record in this case with special attention given to the context within which the allegedly prejudicial misconduct occurred and conclude that the trial judge did not abuse her discretion. We find that although some of the remarks made by defense counsel were objectionable, none of these remarks, considered separately or for their cumulative effect and in the context of a six-day trial, so prejudiced the litigants that they could not receive a fair trial. For these reasons we affirm the judgment of the trial judge.

Judgment affirmed.

DEMPSEY and McNAMARA, JJ., concur.