ROBERT M. COLE, Plaintiff-Appellee, *v.* AVERY BRUNDAGE *et al.,* Defendants-Appellants.

First District (4th Division) No. 61296

Opinion filed March 3, 1976.

Ralph E. Davis, John L. Conlon, and William G. McMaster, Jr., all of Chicago (Hopkins, Sutter, Mulroy, Davis & Cromartie, of counsel), for appellant Avery Brundage.

Rothbart, Stein & Moran, of Chicago (Thomas E. Moran, George E. Sweeney, and Edward V. Scoby, of counsel) for appellant Samuel E. Schulman.

Hoffman & Davis, of Chicago (Sol A. Hoffman, Edward J. Hladis, and Alvin L. Kruse, of counsel), for appellee.

Mr. JUSTICE BURMAN delivered the opinion of the court:

The plaintiff, Robert M. Cole, commenced this action for a broker's commission arising out of the sale of the La Salle Hotel by the defendant Avery Brundage (hereinafter referred to as Brundage) to the defendant Samuel Schulman (hereinafter referred to as Schulman) on November 4, 1970.[1] After a lengthy trial the jury returned a verdict in the amount of $133,500 against each defendant. In response to special interrogatories submitted by Brundage, the jury found that an implied brokerage contract existed between plaintiff and each of the two defendants. The trial court entered judgments on these verdicts, thus giving rise to the instant appeal by both Brundage and Schulman.

The defendants were represented by separate firms of attorneys and

---

[1] More precisely, the instant transaction entailed the sale of Brundage's 96% stock interest in the La Salle Madison Hotel Company, an Illinois corporation which owned the La Salle Hotel, to the La Salle Hotel Company, a limited partnership of which Schulman was a limited partner.

each of them pursued separate although partially overlapping defenses. Consequently, while the issues raised on appeal are distinct, they retain common denominators. Brundage contends that the trial court erred in denying his motion for a judgment notwithstanding the verdict because of the insufficiency of the evidence as to (1) the creation of any implied brokerage contract between the plaintiff and himself or (2) the creation of an implied dual brokerage arrangement whereby plaintiff could have represented both him and Schulman. Schulman contends that (1) a buyer of real estate customarily is not responsible for a broker's commission in the absence of a special agreement and the record is devoid of any evidence indicating that he had a special agreement with plaintiff; (2) plaintiff is not entitled to collect a commission from both Brundage (seller) and himself (buyer) due to the plaintiff's failure to disclose his purported dual agency; and (3) plaintiff failed to prove a necessary element of an implied contract, namely, that he (Schulman) was cognizant that the plaintiff expected to be compensated by him for his efforts.

Besides the above contentions pertaining to plaintiff's brokerage commission, both defendants maintain that the trial court erroneously instructed the jury as to the law governing the case. In addition Brundage contends that the trial court erred in (1) admitting certain testimony concerning custom and usage in the payment of brokerage commissions, (2) refusing to admit a letter written by another broker to plaintiff, and (3) failing to order plaintiff to produce certain memoranda for Brundage's inspection.

Before delving into the pertinent facts surrounding the instant controversy, it is important to present a biographical sketch with regard to the parties in interest. Plaintiff has been a licensed real estate broker in Chicago since 1934. During this time frame, he has dealt almost exclusively in commercial and industrial property and has had extensive experience with complicated and expensive properties. Brundage, who died on May 8, 1975, during the pendency of this appeal, had been in the construction business for 30 years. He had been a real estate broker but acted solely in management of buildings. At the time of the trial, his occupation was confined to the management of his own personal affairs, which included the ownership and operation of the La Salle Hotel. He also served as president of the International Olympic Committee from 1952 to 1972. Schulman also has had extensive real estate experience which encompassed the ownership, construction and operation of a number of buildings in Chicago.

■■ A review of the record reveals that it is replete with conflicting testimony. However, in considering whether either or both defendants

were entitled to a directed verdict or a judgment *n.o.v.*, we must keep in mind that the party resisting said motions is entitled to the benefit of all the evidence favorable to him. The oft cited rule is that a defendant is entitled to a directed verdict or a judgment *n.o.v.* when all of the evidence, viewed in its aspect most favorable to the plaintiff, so over-whelmingly favors the defendant that no contrary verdict based on such evidence could ever stand. (*E.g., Risse v. Woodard* (7th Cir. 1974), 491 F.2d 1170, 1171; *Schmidt v. Archer Iron Works, Inc.*, 44 Ill. 2d 401, 405, 256 N.E.2d 6, 8, *cert. denied*, 398 U.S. 959; *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.) The following facts are presented in conformance with this rule.

Plaintiff's initial encounter with Brundage occurred in 1947 when he personally submitted an offer of $8.5 million for the purchase of the La Salle Hotel on behalf of a real estate investor. In response to this proposal, Brundage informed the plaintiff that he had not owned the hotel for a sufficient period of time nor had he properly developed it to justify a sale at that point in time. However, Brundage did indicate, as he did on subsequent occasions, that he would sell the hotel to the right party, at the right time, and at the right price. Although the plaintiff made periodic inquiries with Brundage concerning the possible sale of the hotel, his next personal contact with him arose in the late 1950's. At that time, the First National Bank of Chicago was experiencing difficulty in procuring an entire block for its new building. Speculating that the bank would be interested in the block where the hotel was situated, the plaintiff obtained a verbal sales figure of $8 million from Brundage, but no sale was ever consummated. Subsequent to this meeting, the plaintiff did not converse in any manner with Brundage until September, 1964, when, as a result of the following facts, negotiations for the hotel between Schulman and Brundage commenced.

Plaintiff had known Schulman for approximately 20 years and had acted in his behalf in various business transactions. These transactions included the purchase and sale of buildings located in Chicago, Illinois. In 1964, Schulman, general partner and operating manager of the Water Tower Inn Hotel, was interested in leasing that hotel. Plaintiff procured a prospective lessee for the hotel, but, after several months of negotiations, a lease of the hotel did not reach fruition. However, during the course of a meeting between the plaintiff, Schulman, and Frank Little (another real estate broker) concerning the possible lease, Schulman stated that if he were successful in disposing of his responsibilities in the Water Tower Inn, he would be interested in a major property. He indicated a preference for La Salle Street properties. Plaintiff responded to this statement by opining that the only major property that could be

acquired was the La Salle Hotel. Subsequent to Schulman's expression of interest in such property, the plaintiff stated that he would proceed to negotiate.

Approximately 2 weeks later, plaintiff engaged Schulman in a telephone conversation. During their talk Schulman related that he wanted to make an offer for the hotel. Pursuant to this request, plaintiff contacted Brundage and informed him that he might have an offer for the hotel. Thereafter, plaintiff met with Schulman at the Water Tower Inn. Schulman told him that due to plaintiff's ability to handle such matters, he wanted him to take an offer of $8.4 million ($6 million in cash and the remainder to cover an existing mortgage) to Brundage. Schulman stated further that if Brundage expressed the slightest bit of interest, the offer would be formalized in writing with the earnest money on the following Monday. Upon termination of this meeting, plaintiff proceeded to Brundage's office where Schulman's offer was rejected by Brundage. Plaintiff thereafter telephoned Schulman and advised him of the rejection.

In October, 1964, plaintiff arranged a meeting at Brundage's office between Brundage, Schulman and himself. At that meeting, plaintiff formally introduced Schulman to Brundage. Plaintiff discussed Schulman's qualifications as a hotel operator and further requested certain financial data relating to the operation of the hotel. In response to this request, Brundage telephoned Frederick Ruegsegger, his executive assistant and also the comptroller and general manager of the hotel, and told him to supply the plaintiff with such financial information. Moreover, when the meeting concluded, Brundage arranged a tour of the hotel for the plaintiff and Schulman. Subsequent to this meeting, the plaintiff personally met with Ruegsegger who supplied him with financial information relating to the operation of the hotel. Plaintiff thereafter sent a copy of said data to Schulman.

The next meeting concerning the possible sale of the La Salle Hotel occurred at Brundage's office on April 20, 1965. Present were plaintiff, Brundage, Schulman and Ruegsegger. Although the duration of the meeting was approximately an hour, numerous topics were discussed, including the price and conditions of the sale, the assets of the hotel, and the tax aspects of the transaction. Besides this meeting, the only contacts the parties had during the remainder of 1965 were numerous telephone calls and luncheon meetings between plaintiff and Ruegsegger, in which the latter provided plaintiff with further data concerning the hotel.

In June, 1966, Brundage telephoned plaintiff and asked him to come to the hotel immediately. When he arrived, Brundage informed him that

another group had offered approximately $10 to $12 million for the hotel. After disclosing the terms of the offer, Brundage expounded that since "the [plaintiff] worked with [him] for some time, [he] would give [the plaintiff] the opportunity to better this offer or possibly to even meet this offer." Despite the occurrence of these events, the sale of the hotel was not consummated between the years 1966 and 1969, largely due to pending litigation involving the hotel and the Internal Revenue Service. However, plaintiff still kept communications open during this time span by meeting and speaking with Ruegsegger and Schulman. Ruegsegger further supplied plaintiff with updated information of a highly confidential nature. Moreover, in the fall of 1969, in response to Ruegsegger's request, the plaintiff attempted to arrange a meeting between Brundage, Schulman and himself. He was unsuccessful, however, because of Schulman's inability to attend at that particular time as well as Brundage's subsequent departure from the country in connection with the Winter Olympics.

Negotiations for the hotel resumed in March, 1970, when, subsequent to the plaintiff furnishing Schulman with a valuation of the hotel, the latter asked plaintiff to arrange a meeting with Ruegsegger. After calling Ruegsegger, the three individuals met and engaged in discussions about the hotel for about an hour. Thereafter, in May, 1970, the same persons met again in plaintiff's office where the basic terms of the eventual sale were structured. During these discussions plaintiff suggested that in light of the insight he obtained from mortgage lenders, builders and managing agents, the value of the property, absent the hotel, was $9 million. He further suggested that Schulman offer that amount for the hotel as well as alleviate an existing mortgage of $1.7 million by paying part of it in cash and the other part by way of a purchase money mortgage. When the meeting concluded, Schulman asked plaintiff to allow him to make his offer directly to Brundage so as to build his personal rapport with him. Moreover, he told plaintiff not to "have [any] worries about your commission" since he "would never sign any document unless [plaintiff's] commission was provided for."

A few days after the meeting at the plaintiff's office, plaintiff asked Schulman if he made the offer of $9 million. Schulman responded in the affirmative, but he added that in light of some inventories and a discrepancy in the exact land area, he might want to back down $100,000. Following this meeting, plaintiff immediately called Ruegsegger and requested that he [the plaintiff] be present at any further meetings because "Brundage might not remember [him] as a broker in the transaction." Ruegsegger assured plaintiff that he would be included in any future meetings. Approximately 2 days subsequent to plaintiff's and

Schulman's meeting, Schulman came to the plaintiff's office and, with plaintiff's permission, took his file containing the information on the hotel.

The next relevant contact plaintiff had with Schulman took place on October 15, 1970, when plaintiff telephoned Schulman regarding the status of the hotel negotiations. Schulman's response to such inquiry was that nothing had occurred. However, on November 4, 1970, plaintiff learned of the sale of the hotel by Brundage to Schulman from an announcement on a television news program. Pursuant to the contract entered into by the parties, whose terms were essentially the same as those proposed by plaintiff in May, 1970, the hotel was sold for $8.9 million, payable partly in cash and partly by mortgage. Moreover, although Schulman and Brundage engaged in a 30-minute discussion during their final negotiations concerning the payment of a brokerage commission, the contract only provided that each party would be responsible for any commission that he incurred, and that neither of them would have any obligation for any commission incurred by the other. In light of this contractual provision coupled with plaintiff's futile efforts in attaining his brokerage commission from either Schulman or Brundage, he commenced an action against both of them on December 16, 1970. After two amendments to plaintiff's complaint as well as pretrial motions and orders pertaining to certain discovery matters, the trial began. On June 10, 1974, the jury returned a verdict and a judgment was entered for plaintiff in which he was awarded damages against each defendant in the amount of $133,500.

■■ We first consider Brundage's contentions on appeal concerning the denial of his motion for a judgment notwithstanding the verdict. With regard to his assertion that there was insufficient evidence of an implied brokerage contract between the plaintiff and himself, Brundage maintained at trial that he presumed plaintiff was acting in behalf of Schulman. Moreover, he posits on appeal that where the impetus for the broker's contract with a seller is attributed to the buyer, courts are inclined to conclude that the broker was working for and would be compensated by the buyer. (See *Bennett v. H. K. Porter Co., Inc.*, 13 Ill. App. 3d 528, 531, 301 N.E.2d 155, 157; *Lynch v. Nachusa Hotel Corp.*, 93 Ill. App. 2d 250, 254, 235 N.E.2d 260, 262.) While plaintiff does not controvert the fact that he never discussed his retention as a broker with Brundage nor did he inform the latter that he expected to receive a commission from him, he does maintain that he is entitled to a commission from Brundage on the basis that an implied contract was created by their course of dealings. We are in accord.

It is well settled in Illinois that no particular form of words is necessary to engage the services of a real estate broker; rather, the essential

prerequisite is action by the broker with the consent of the principal and such consent can manifest itself either in writing, orally or by implication from the conduct of the parties.(*E.g., Van C. Argiris Co. v. Caine Steel Co.,* 20 Ill. App. 3d 315, 323, 314 N.E.2d 361, 367; *Dickerson Realtors, Inc. v. Frewert,* 16 Ill. App. 3d 1060, 1063, 307 N.E.2d 445, 447.) Moreover, whether a broker has attained his principal's consents is determined from the facts and circumstances of each case. (*Bennett v. H. K. Porter Co., Inc.,* 13 Ill. App. 3d 528, 532, 301 N.E.2d 155, 158.) Assuming this consent has been given, it has been held that a broker is entitled to a commission when it is proven that either (1) he procured a prospective purchaser who was ready, willing and able to buy on terms acceptable to the seller (*Ellis Realty v. Chapelski,* 28 Ill. App. 3d 1008, 1011, 329 N.E.2d 370, 373; *Western Pride Builders, Inc. v. Zicha,* 23 Ill. App. 3d 770, 773, 320 N.E.2d 181, 183), or (2) that the sale was procured or effected through his efforts or through information derived from him, regardless of whether the owner made the sale himself or through another broker. *Van C. Argiris Co. v. Caine Steel Co.,* 20 Ill. App. 3d 315, 322, 314 N.E.2d 361, 366.

Upon review of the record, we believe that the jury was justified in finding from the evidence that an implied brokerage contract existed between plaintiff and Brundage. Besides presenting an offer for the La Salle Hotel to Brundage on behalf of another real estate broker in 1947 as well as obtaining Brundage's authorization to offer the hotel to the First National Bank of Chicago in the late 1950's, the first relevant factor in the instant case, which evinces Brundage's consent to the plaintiff's conduct, pertains to the manner in which plaintiff was treated by Brundage and Ruegsegger in contradistinction to other brokers. As reflected in Ruegsegger's testimony at trial, his treatment of other real estate brokers who inquired about a possible sale of the La Salle Hotel ranged from not taking their telephone calls to having the police physically remove them from his office. However, when plaintiff initially called Ruegsegger, the latter checked out plaintiff and cleared him with Brundage. He either personally met or spoke with the plaintiff about 25 to 50 times between 1964 and 1970 concerning the sale of the hotel. During such time, Ruegsegger also provided the plaintiff with updated financial information of a highly confidential nature concerning the management and operations of the hotel, regardless of whether plaintiff requested such information or not. Although Brundage indicated on cross-examination that (1) Ruegsegger never cleared plaintiff with him and (2) that he (Brundage) never disclosed any financial data to anyone, he did respectively state on re-cross-examination and cross-examination by counsel for plaintiff that (1) subsequent to perusing a letter

dated November 16, 1965, he remembered Ruegsegger advising him that plaintiff had made an inquiry about the hotel and (2) he was aware of five personal meetings between Ruegsegger and plaintiff during the period 1965-1970 and that Ruegsegger reported to him as to what transpired at such meetings. Moreover, Brundage testified on cross-examination by Schulman's counsel that he did not know whether Ruegsegger gave plaintiff financial data, but if so, he had his authorization. He also testified on re-cross-examination by plaintiff's counsel that he assumed that plaintiff was a real estate broker.

The second integral factor exemplifying Brundage's consent to the plaintiff's action was the transformation of Brundage's assumption that plaintiff was a broker into a realization and recognition in June, 1966. At that point in time Brundage telephoned plaintiff and requested him to come to the La Salle Hotel immediately. Plaintiff did so and was informed by Brundage that another group offered to purchase the hotel. As mentioned earlier, Brundage outlined the terms of the offer. He then remarked that since plaintiff worked with him for some time, he was giving him the opportunity to better or possibly match such offer. Moreover, at some point during their negotiations, Ruegsegger telephoned plaintiff and advised him that a wealthy individual living in Dallas, Texas would be a potential prospect for the purchase of the La Salle Hotel. Besides Brundage's recognition of plaintiff's status as a broker, Ruegsegger also acknowledged in 1970 plaintiff's role in the negotiations between Brundage and Schulman. As plaintiff testified at trial, subsequent to learning that Schulman made an offer for the hotel, he immediately telephoned Ruegsegger and requested that he (the plaintiff) be present at any further meetings pertaining to the transaction since Brundage might not remember him as a broker in the transaction. Plaintiff expounded that Ruegsegger agreed with him fully and assured him that he would be included in any further meetings.

The above enunciated factors not only evince Brundage's consent to plaintiff's conduct, but also distinguish, in part, the instant case from the two cases (*Whiston v. David Mayer Building Corp.*, 337 Ill. App. 67, 84 N.E.2d 858; *Straus v. Spiegel, Inc.*, (7th Cir. 1946), 153 F.2d 268) upon which Brundage primarily relies in support of his contention that there was insufficient evidence of an implied brokerage contract. In the first place, the defendant's reference to the *Whiston* decision is somewhat misplaced since the reviewing court in that case held that the question of whether the facts and circumstances are sufficient to imply a brokerage contract must be resolved on their own facts. (*Whiston v. David Mayer Building Corp.*, 337 Ill. App. 67, 72, 84 N.E.2d 858, 860.) Moreover, the cases relied on by Brundage pertained to lease

arrangements and not the actual sale of real estate which entails other considerations. Finally, the instant case contains more facts than the other two from which to base an implied contract. In *Whiston*, the plaintiff-broker expressly asked permission of an officer of the defendant-lessor corporation to represent the defendant in connection with a possible lease to United Airlines of a building owned by the defendant. Although the officer initially indicated that he had no time to discuss an "embryonic deal," a meeting between the plaintiff, the officer and a representative of United did transpire but no agreement was reached. However, the plaintiff later discovered that United and the defendant entered into a lease analogous to the terms discussed at the meeting which he arranged. The reviewing court, in considering such evidence, held that even though the defendant's officer never rejected the plaintiff's request to represent the defendant, no implied brokerage contract was created since there was no basis for implying that the defendant's officer accepted the plaintiff's offer. In the case at bar, however, the conduct of Brundage and Ruegsegger in permitting, authorizing and encouraging plaintiff to procure a purchaser of the hotel as well as furnishing plaintiff with updated highly confidential information clearly reflects Brundage's cognizance that plaintiff was representing him.

The factual scenario in *Straus* is also distinguishable. In that case, representatives of the Army were seeking building space and came to the plaintiff-broker. The plaintiff submitted a list of available properties which included three of the defendant's buildings. The plaintiff thereafter introduced an Army representative as a prospective lessee to an officer of the defendant-lessor corporation. Subsequently, the defendant's officer, who knew that the plaintiff was a real estate broker, requested that he (the plaintiff) use his influence to lease a certain building rather than one of the two other buildings which the defendant owned. Although the plaintiff adhered to this request, the Army entered into a lease with the defendant without notice to the plaintiff. Based on such evidence, the Seventh Circuit held that an implied contract was not created because of the plaintiff's failure to allege and prove that (1) he was employed by the defendant to lease its building and (2) that the plaintiff rendered his services under circumstances known to the plaintiff from which an obligation to pay a commission was implied. Yet, in analyzing the facts in the instant case, it is apparent that a similar result cannot be reached since plaintiff's status as a broker was expressly recognized by Brundage in 1966 when he called plaintiff to his office and by Ruegsegger in 1970 when he agreed that plaintiff should be present at all subsequent meetings concerning the transaction. Analogous to the refutation of the *Whiston* decision, the fact that plaintiff was supplied

with such highly confidential information, even when he did not formally request it, adds further credence that Brundage impliedly authorized him to procure a purchaser of the hotel. Therefore, we believe that, based on the course of dealings between plaintiff on one hand and Brundage and Ruegsegger on the other coupled with plaintiff's efforts in (1) introducing Brundage to Schulman and (2) structuring the sale which both defendants ultimately agreed to, the evidence amply supports the jury's express finding that an implied contract existed between plaintiff and Brundage.

■■ We further reject the contentions of both defendants that the evidence was insufficient to establish that plaintiff acted as a broker for both defendants. Although it has generally been held that a real estate agent cannot act for both the vendor and purchaser of the same property and collect a commission from both individuals (*e.g., Bunn v. Keach*, 214 Ill. 259, 269, 73 N.E. 419, 420; *Field v. Ingersoll*, 228 Ill. App. 457, 464-65), there is a well-known exception to this rule, namely, where the agent represents both parties with their full knowledge and consent and acts in good faith. (*E.g., Field v. Ingersoll*, 228 Ill. App. 457, 465; *Madden v. Davis*, 192 Ill. App. 575, 577.) Both defendants rely on plaintiff's own testimony in which he indicated (1) his uncertainty as to who would pay his commission and (2) that he never declared his dual role to either of them nor told either party that he expected to be compensated by him. Nevertheless, we believe that the prerequisites necessary for the above mentioned exception to apply were exemplified in the conduct of the parties in interest over the 6-year period during which the sale to Schulman was negotiated.

Viewing the evidence in a light most favorable to the plaintiff, plaintiff did act in good faith. As plaintiff testified at trial, his function as a broker was to "bring [the] buyer and seller together" through his expertise in real estate matters. In so doing, it was his practice to deal fairly with both parties and, absent an exclusive agency with one party, assist them in arriving at a fair price that did not favor either the vendor or the purchaser. Both defendants maintain that if plaintiff truly dealt fairly with them as their mutual broker, he would have respectively disclosed to each of them that he was the broker for the other defendant. Yet, in light of the experience both Schulman and Brundage had in the real estate field, it is inconceivable that either of them was not cognizant of (1) plaintiff's dual brokerage and (2) that he would be entitled to a commission if the sale was consummated by them.

As previously indicated, plaintiff, who brought prospective buyers to Brundage, disclosed to him that Schulman, whom Brundage neither personally knew nor had previous business transactions with, was in-

terested in buying the hotel. Plaintiff thereafter introduced the two defendants at a meeting. He then evaluated certain information obtained from mortgage lenders, builders and managing agents, and submitted a proposal regarding the price of the hotel to Schulman. The two defendants essentially incorporated his proposal into their ultimate contract of sale.

Besides plaintiff's action in (1) introducing the two defendants, (2) maintaining negotiations for the sale of the hotel through the years, and, as plaintiff testified at trial, (3) structuring the transaction with which both defendants were satisfied, the two defendants' own conduct in discussing brokerage commissions during their final negotiations clearly represents an awareness on their part that plaintiff was acting as broker for both of them. As the record reveals, when Schulman asked plaintiff to meet with Brundage alone and present an offer, Schulman told him not to have any worries about his commission since he (Schulman) would never sign any document that did not provide a commission for plaintiff. Moreover, Schulman testified in his deposition that, possibly due to his own initiative, there was some discussion concerning brokerage commissions in which plaintiff's name was mentioned and someone said "let's be protected here." In addition, Brundage remembered, on direct examination, at least two meetings during the late summer of 1970 between Schulman and himself in which they discussed the matter of brokerage commissions. He stated further that when Schulman responded that he had no broker, he (Brundage) suggested that a statement to that effect be incorporated into their contract. Thereafter, the record discloses that the contract was drafted and initially provided that Schulman would be responsible for any commission for which Brundage was liable. However, due to Schulman's objections and further deliberations between the defendants, it was finally agreed in writing that each defendant would be liable for any commission that he incurred but not for any obligation attributable to the other.

We believe that such deliberations by the defendants do evince a cognition on their part of plaintiff's dual brokerage. In the first place, if Brundage and Schulman stated that neither had a broker, then why did they engage in discussions about brokerage commissions. Secondly, their discussions regarding this subject could only pertain to plaintiff's efforts since the record is devoid of any evidence that another broker was involved in any negotiations between the two defendants. Moreover, plaintiff testified that when he met with Schulman subsequent to the sale of the hotel, the latter informed him that the two defendants engaged in a 30-minute discussion about his commission and that he deserved a commission. Therefore, in light of the above reasoning, we

believe that in actuality, the defendants' negotiations were merely concerted efforts by two sophisticated investors in real estate who attempted to camouflage their knowledge that plaintiff was representing both of them while simultaneously playing a game of "hot potato" with his commission.

■■ While both defendants contend in the alternative that plaintiff never informed either of them about a commission, the converse of this assertion is also true. Neither Brundage nor Schulman ever informed plaintiff during the course of negotiations for the hotel that he would not receive a commission from him. On the contrary, as previously mentioned, plaintiff testified that Schulman respectively told him on two separate occasions that (1) he would not sign a contract for the hotel unless plaintiff's commission was provided for and (2) that plaintiff deserved a commission. Moreover, plaintiff indicated at trial that it was not a practice for him to make an issue of a brokerage commission in the early stages of negotiations. Instead, he would raise the matter when the parties seemed serious. Based on what transpired in the instant case, however, the defendants never gave plaintiff the opportunity to discuss the matter of a commission since they closed the deal for the hotel without his presence or knowledge. Thus, it cannot be said that plaintiff created an ambiguous role in this transaction. On the contrary, his consistent efforts in exhibiting good faith coupled with both defendants' knowledge and consent to such conduct were sufficient to have met the standards for a dual brokerage.

We also find that Schulman's other two bases of appeal regarding plaintiff's brokerage commission do not warrant a reversal of the trial court's judgment. With regard to the first contention, Schulman maintains, as he did in his motion for a directed verdict at trial and his post-trial motion for a judgment notwithstanding the verdict, that the overwhelming weight of the evidence does not evince a special agreement between plaintiff and himself so as to upset the normal expectation that any real estate commission due would be paid by the seller. In support of this position, he cites *Webster v. Hochberg*, 105 Ill. App. 2d 466, 477, 245 N.E.2d 529, 535, wherein it was held that in the absence of any contrary provision, the payment of compensation of a broker is the responsibility of the owner. Moreover, he relies on plaintiff's own testimony as well as the testimony of the witnesses called by the plaintiff to verify that a broker normally expects his commission to come from the seller. Yet, viewing the evidence and all reasonable inferences therefrom in a light most favorable to the plaintiff, we believe that plaintiff and Schulman had an implied oral special agreement to pay the former a commission if he were successful in negotiating the sale of the hotel.

While we initially do not controvert the proposition of law in the *Webster* decision, we are of the opinion that the decision relied on by plaintiff, namely, *Wright v. McClintock*, 136 Ill. App. 438, is dispositive of this issue concerning whether plaintiff and Schulman had entered into a special agreement. In the first place, the facts in the *Webster* decision are significantly distinguishable from the instant case since the former controversy did not pertain to the liability of a buyer for a commission; rather, as Schulman admits in his reply brief, the crux of that cause of action involved a broker's claim against a seller. On the other hand, in *Wright*, the purchaser informed the broker during the course of negotiations that he would like to meet with the seller and that "[i]f any sale is made I shall protect your fee." (*Wright v. McClintock*, 136 Ill. App. 438, 440, 442.) The buyer then met with the seller alone and closed the deal without making any provision for the broker's commission. In affirming the trial court's judgment for the broker, the reviewing court held that based on the buyer's representations to the broker, he was liable for the commission.

Analogous to the buyer's representations in the *Wright* decision, Schulman's remarks to plaintiff did establish an implied special agreement, thereby making him liable for plaintiff's commission. While the record is replete with extensive evidence of the continuous broker-client relationship between Schulman and plaintiff emanating back to 1954, the most convincing transaction in the case at bar which exemplifies a special agreement between them occurred at a meeting at plaintiff's office in May, 1970. As the plaintiff testified at trial, he, Schulman, and Ruegsegger discussed the terms of the proposed deal and, at the conclusion of such meeting, Schulman asked plaintiff for permission to meet with Brundage alone and present an offer so as to build a personal rapport. Schulman then informed the plaintiff not to have any worries about his commission since he (Schulman) would never sign any document unless a provision concerning plaintiff's commission was contained therein. We believe that in light of these factual parallels between the buyer's remarks in *Wright* and Schulman's comments in the instant case, the latter did specially agree to pay plaintiff's commission.

We further are of the opinion that Schulman's reliance on the testimony of the plaintiff and of the witnesses whom he called as to custom and usage is not justified by the instant facts. While Schulman refers to such testimony as additional authority for the proposition that the seller customarily pays a brokerage commission, the record discloses that Schulman himself conscientiously disregarded this so-called traditional rule. Although the subject of a broker's commission was discussed by the two defendants during their final negotiations for the sale of the

hotel, from which plaintiff was excluded, Schulman never insisted at such time that Brundage, as the seller, was obligated to pay the commission to a broker if such commission were ever established. On the contrary, the first draft of the sales contract provided, in essence, that the buyer would be responsible for such commission. However, due to Schulman's objections, the contract provided that each defendant would be responsible for any commission that he had incurred but not for any obligation attributable to the other. Based on Schulman's deliberative effort not to follow custom while simultaneously attempting to preclude the payment of a brokerage commission to anyone, we believe that the jury was justified in finding from the evidence that Schulman was obligated to pay plaintiff's commission.

Concerning Schulman's last contention with regard to plaintiff's brokerage commission, he maintains that plaintiff failed to prove an essential element of an implied contract since there was not any evidence of his knowledge that plaintiff expected to be compensated by him. While Schulman resorts to the Restatement of Agency (Restatement (Second) of Agency §441 (1958)), a treatise, (2 Mecham, Law of Agency §2426 (2d ed. 1914)), judicial decisions, (*Zwikel v. W. F. Hall Printing Co.*, 7 Ill. App. 3d 853, 857, 289 N.E.2d 111, 114; *Young v. Zimmer*, 56 Ill. App. 2d 298, 304-07, 206 N.E.2d 281, 284-85), and testimony at trial in support of his position, it must be remembered that a reviewing court will not substitute its judgment for that of the trier of fact unless the findings are clearly against the manifest weight of the evidence. (*E.g., Lau v. West Towns Bus Co.*, 16 Ill. 2d 442, 451, 158 N.E.2d 63, 68, *cert. denied,* 361 U.S. 127; *Wisniewski v. City of Chicago*, 20 Ill. App. 3d 650, 654, 315 N.E.2d 43, 45.) Moreover, it has been held that where there is a factual basis for a verdict, it cannot be said that the verdict is contrary to the manifest weight of the evidence. (*Fandrich v. Allstate Insurance Co., Inc.*, 25 Ill. App. 3d 301, 314, 322 N.E.2d 843, 851.)

Applying these legal precepts to the case at bar, we believe that there was a factual basis for the jury's verdict. The evidence clearly established that plaintiff had known Schulman since 1954 and had represented him in other deals. With regard to the instant transaction, plaintiff testified at trial that when he suggested the La Salle Hotel to Schulman, the latter not only expressed an interest but told him to proceed to negotiate for the hotel. Moreover, in September, 1964, Schulman expressly authorized plaintiff to make an offer of $8.4 million for the property because of plaintiff's ability to handle such matters. Subsequent to such authorization, Schulman requested and received from plaintiff in the spring of 1970 a valuation of the hotel which eventually became the foundation for the ultimate sale of the hotel to Schulman. In addition to these facts,

Schulman promised at the end of the May, 1970 meeting that he would not sign any contract unless a provision for plaintiff's commission was contained therein.

Finally, Schulman's contention at trial that plaintiff represented Brundage and was never his negotiating representative was rebutted by the testimony of Martin McKevitt. McKevitt had been in charge of the real estate department of The First National Bank of Chicago for 35 years. He stated that during that period of time he had occasion to meet frequently with Schulman. McKevitt testified that Schulman remarked to him that "he was negotiating with Brundage for the acquisition of the Hotel La Salle and that [the plaintiff] was the broker who submitted the deal to him and made the introduction of Brundage and Mr. Schulman." Therefore, in light of such testimony as well as Schulman's conduct in (1) employing plaintiff, (2) relying on plaintiff's expertise in making an offer for the hotel, (3) requesting a valuation from plaintiff, and (4) assuring the plaintiff that he would receive a commission, we believe that Schulman either knew or should have known that plaintiff expected to be compensated by him and hence, the jury was correct in finding an implied contract between them.

In sum, while we have enumerated various endeavors and encounters of plaintiff relating to the sale of the La Salle Hotel, it must be remembered that there were many conflicts in the testimony at trial of all the parties in interest. Each defendant respectfully maintained at trial as well as before this reviewing court that plaintiff was not representing him nor was the deal negotiated with his assistance. For example, Brundage testified at trial that during the period 1964 through early 1970, he neither (1) placed the hotel on the market for sale nor (2) contacted plaintiff or any other real estate broker to locate a buyer for the hotel. Moreover, Schulman denied that he ever (1) authorized plaintiff to make any offer for the hotel in his behalf, (2) received any financial information concerning the hotel from plaintiff, or (3) assured plaintiff that he would protect his brokerage commission. However, in light of our disposition of the contentions respectively asserted by each defendant, the evidence as well as pertinent judicial authority did amply support the jury's finding that both Schulman and Brundage had impliedly contracted to pay a brokerage commission to plaintiff.

■■ Brundage next contends that the court erroneously admitted testimony of custom which Schulman introduced whereby the seller of property ordinarily pays the brokerage commission. Both Brundage and plaintiff objected to the testimony on the ground that custom and usage cannot create a contract and that such evidence is admissible only to interpret the terms of a contract. The court overruled the objections and

further denied Brundage's motions for a severance and a mistrial. We are in accord with Brundage that evidence of custom alone is not sufficient to create an implied contract. (*Hedenberg v. Seeberger,* 140 Ill. App. 618.) However, this case presents a different situation. At the time the testimony was introduced, sufficient independent evidence of an implied contract between Brundage and plaintiff was already before the jury. Thus, the evidence of custom did not stand as the sole basis from which the existence of an implied contract could be found. Moreover, we believe any error in the admission of this evidence was cured by giving Brundage's Instruction 18 to the jury. Instruction 18 reads:

"Notwithstanding the existence of any custom for real estate brokers being paid by sellers, a broker may nevertheless be entitled to payment from a seller only when the broker has a contract, express or implied, with the seller for the broker's services."

The erroneous admission of evidence may be deemed cured and rendered harmless when the jury is given appropriate instructions on the law governing the case. (*Miller v. Baltimore & Ohio Southwestern R.R. Co.,* 330 Ill. App. 129, 70 N.E.2d 263 (abstract opinion); *Goad v. Obernagel,* 302 Ill. App. 370, 23 N.E.2d 800.) The case at bar presents such a situation. Brundage's Instruction 18 advised the jury in clear and certain terms that custom could not create an obligation on Brundage's part to pay a commission to plaintiff. Thus, we believe that the jury was not misled by the admission of testimony of custom, and the error, if any, was harmless.

Brundage next contends that the court erred in refusing to admit a letter written to plaintiff in 1964 by one Frank Little. According to plaintiff, Little was a real estate broker who was working with him in connection with the purchase of the La Salle Hotel. The record shows that plaintiff made no objection to the admission of the letter. The sole objection was made by Schulman on the ground that Little was deceased at the time of trial and was not available for cross-examination. The court sustained Schulman's objection. Brundage then moved for a severance and a mistrial, and said motions were denied.

Brundage sought admission of the letter to support his theory that plaintiff and Little were acting as agents solely for Schulman. In this letter Little recalled to plaintiff's attention their mutual past dealings with Schulman concerning the purchase of the hotel. The letter continued in pertinent part as follows:

"My reason for reviewing the foregoing details * * * is because when I met with Sam [Schulman] yesterday he informed me we were to continue to represent him in the possible purchase of the La Salle Hotel and he had requested you to proceed in an

effort to negotiate an equitable *all cash* price that would [be] mutually acceptable.

Sam further advised me, that prior to Avery Brundage's departure for the Orient, he had met with you and Mr. Brundage and discussed, in detail, his definite interest in the proposed purchase of the La Salle Hotel—Sam also expressed his complete confidence [in] our representing him in this negotiation and particularly in your ability to complete this sale."

Brundage stressed that he offered the letter only as to plaintiff to show that in 1964 plaintiff was not working under any impression that he was acting as a broker for Brundage. Brundage argues that had plaintiff been his broker, Little would have made some reference to that fact in the letter. He further argues that had plaintiff been acting as broker for both Schulman and Brundage, Little would have referred to a dual brokerage arrangement. We are not so persuaded.

The record reveals no evidence of agency between plaintiff and Little either by way of principal-agent, partnership or joint venture. Nor is there any evidence that Little had any business relationship with Brundage at all. On the contrary, the record shows that plaintiff alone had been talking with Brundage about the sale of the hotel. Under these circumstances Little had no reason to mention that he and plaintiff were acting as brokers for Brundage, for his sole connection with the matter related exclusively to Schulman. Accordingly, the letter did not serve to impeach or discredit the testimony of plaintiff.

■■ Moreover, the admission of evidence is a matter largely within the discretion of the trial judge, and his decision should not be reversed unless such discretion has been clearly abused. (*Trippel v. Lott*, 19 Ill. App. 3d 936, 312 N.E.2d 369.) Upon review of the record we cannot find such an abuse, particularly when the slight probative value of the letter is weighed against the fact that there was no opportunity for cross-examination. Nor do we believe there were any grounds for a mistrial or a severance since the evidence was properly excluded.

Brundage also contends that he was entitled to the production of certain factual memoranda prepared by plaintiff, or in the alternative to a hearing with respect to their production. It appears that in a deposition session on December 17, 1973, counsel for Brundage learned that plaintiff had prepared at least two factual memoranda at the request of his attorneys. The memoranda concerned his negotiations with Brundage and Schulman. Thereafter, Brundage filed a series of pretrial motions for the production of the memoranda on the ground that they had been used by plaintiff to refresh his recollection. Plaintiff opposed the motions on the dual grounds that the memoranda were work product and were pro-

tected by the attorney-client privilege. Ultimately, the motions were denied without prejudice to their renewal at trial. At trial Brundage presented a written motion for the production of the memoranda, or alternatively, for a hearing to determine whether they had been utilized by plaintiff prior to testifying to refresh his memory. Plaintiff again argued that the memoranda were protected by the attorney-client privilege, and the trial court denied the motions.

At the outset we must emphasize that plaintiff did not utilize the documents while testifying. Had he done so, the law is clear that Brundage should have been permitted to review their contents. (*People v. Cassidy,* 283 Ill. 398.) Rather, the argument is made that production should have been granted because plaintiff refreshed his recollection out of court prior to testifying. In support of his argument Brundage cites *People v. Scott,* 29 Ill. 2d 97, 193 N.E.2d 814, where it was held that a party is entitled to examine documents used by a witness to refresh his recollection prior to testifying. We must note, however, that the *Scott* case involves a criminal charge of felony, and, in our opinion, is distinguishable on that basis. Significantly, the rule in *Scott* has never been applied in civil proceedings.

■■ As stated by the United States Supreme Court in *Goldman v. United States,* 316 U.S. 129, 86 L. Ed. 1322, 62 S. Ct. 993, "We think it the better rule that where a witness does not use his notes or memoranda in court, a party has no absolute right to have them produced and to inspect them." (316 U.S. 129, 132.) Throughout the States numerous other recent decisions adhere to this view. (See Annot., 125 A.L.R. 19, 200 (1940); Annot., 82 A.L.R.2d 473, 562 (1962).) Thus, under the instant circumstances, the production of memoranda is a matter largely within the discretion here, particularly in light of plaintiff's claim that the memoranda were protected from disclosure by the attorney-client privilege and the work product rule. *Rose v. B. L. Cartage Co.* (1969), 110 Ill. App. 2d 260, 249 N.E.2d 199; *Johnson v. Squires,* 256 Ill. App. 170.

Both Brundage and Schulman also raise several issues with regard to jury instructions. Brundage contends that the court erroneously refused to give his offered instructions numbered 30,[2] 31,[3] and 32.[4] In substance

[2] Brundage's Instruction 30 reads:
"During the period 1965 through 1970, there was in effect in Illinois a statute which provided in relevant part as follows:
'Every person shall be deemed to have committed a violation of [the law] who shall:
(1) Make any contract with, or engage in any combination or conspiracy with, any other person who is, or but for a prior agreement would be, a competitor of such person:

these instructions advised the jury that if it found the recommended rates of the Chicago Real Estate Board (CREB) has been established in violation of the Illinois Antitrust Act, then it could not employ said rates in determining the amount of any commission payable to plaintiff. After considerable argument by counsel, the court refused the instructions on the basis that the trial did not involve the legality of the CREB rates.

At the outset we must comment that the record provides little basis from which a jury could determine the legality of the CREB recommended rates. And we think it absurd to suggest that such an intricate matter can be determined in a suit where it constitutes merely a collateral consideration. Moreover, it appears to us that it was Brundage who first injected evidence of the CREB recommended rates into the controversy. The record reveals that plaintiff carefully avoided the subject until Brundage brought it up. We note that although plaintiff had relied on the CREB recommended rates in his second amended complaint to establish reasonable commission charges, he subsequently amended his complaint to delete any reference thereto. Nor did he mention the CREB rates in his opening statement. Finally, plaintiff was the first witness to testify at trial. On direct examination he made no reference to those rates. He testified only that based on his experience as a real estate broker, 3 percent of the total purchase price would be a fair commission. It was Brundage's attorney who, during cross-examination of plaintiff, first brought out the existence of the CREB recommended rates. Thus, it appears to us that Brundage created the situation for which he sought a curing instruction.

■■ In any event, we are satisfied that the error, if any, was harm-

---

(a) for the purpose or with the effect of fixing, controlling, or maintaining  *  *  *  the fee charged or paid for any service performed or received by the parties thereto  *  *  *.' ”

[3] Brundage's Instruction 31 reads:

"To prove a contract, combination or conspiracy to fix, control or maintain fees in violation of the statute, it must be shown that the members in some way or manner, or through some contrivance, positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan. It is not necessary to show that the members entered into any express or formal agreement, or that they directly, by words spoken or in writing, stated between themselves what their object or purpose was to be, or the details thereof, or the means by which the object or purpose was to be accomplished."

[4] Brundage's Instruction 32 reads:

"If you find the Chicago Real Estate Board rates, as customarily employed by members of the Chicago Real Estate Board, were the product of a contract, combination or conspiracy to fix, maintain or control the level of fees charged by those members, then the Chicago Real Estate Board rates may not be employed by you in determining the amounts, if any, which would constitute reasonable compensation for the services claimed to have been performed in this case."

less. Defendants presented no evidence as to what constitutes a reasonable commission. The only evidence relating thereto was introduced by plaintiff. As stated above, plaintiff testified that 3 percent or $267,000 was a fair commission based on his own experience. Plaintiff also called two expert witnesses with regard to the question of reasonable commissions. One such witness was Gilbert Scribner, president of a real estate brokerage and management firm, and licensed broker since 1946. Scribner testified that the CREB rates suggest a commission of $273,500. He further testified that said commission would be reasonable even if it was not based on the CREB rates. The other expert witness to testify was Edward Paulson, a licensed broker for 35 or 40 years who specialized in hotel properties. Paulson testified that a commission of 3 to 5 percent was reasonable, and that said rate was customary even before the CREB rates were established. The record shows that the jury returned a verdict of $267,000. This is the lowest amount to which any witness testified and is lower than the former CREB recommended rates. Thus, it appears that the evidence concerning the recommended rates did not affect the verdict, and consequently, Brundage was not prejudiced by the refusal of his instructions. As stated in *Trippel v. Lott,* 19 Ill. App. 3d 936, 945, 312 N.E.2d 369, 376, "Unless it appears that the rights of the complaining party have in some way been prejudiced by the giving or failure to give instructions the case will not be reversed on such ground alone."

Schulman raises four further issues concerning the propriety of the jury instructions. Before discussing these contentions, however, we believe several observations are necessary. As the foregoing discussion demonstrates, this is a case of extreme factual complexity. Understandably, all three parties submitted jury instructions on virtually every point in the case. The conference on instructions was lengthy, and the trial judge made a concerted effort to modify the instructions so as to incorporate the ideas and suggestions of the parties. By necessity the trial judge chose those instructions which he considered to be most appropriate, and in so doing, he acted in his discretion. (*Lau v. West Towns Bus Co.,* 16 Ill. 2d 442, 158 N.E.2d 63.) Numerous instructions were given to the jury, and the propriety of each cannot be considered without regard to the others. The test to be applied is whether the instructions considered as a whole and read in a series are sufficiently clear so as not to mislead, and whether they fairly and correctly state the law. Thus, a deficiency in one instruction may be cured by another. (*Ruggiero v. Public Taxi Service, Inc.,* 16 Ill. App. 3d 754, 306 N.E.2d 567.) With these considerations in mind, we now turn to the specific issues raised by Schulman.

Schulman first contends that the court improperly instructed the jury

by giving plaintiff's instructions 11[5] and 18[6] and by refusing his instruction 3.[7] The thrust of Schulman's argument is that plaintiff's instructions 11 and 18 merely advised the jury that anyone who deals with a person whom he knows to be a broker impliedly promises to pay the broker a commission if he is the procuring cause of the sale. He emphasizes that instructions 11 and 18 fail to state that for an implied contract to exist, Schulman should have known that plaintiff expected compensation from him. Upon careful review of the record, we are of the opinion that the jury was properly instructed.

The record reveals that while the court refused Schulman's instruction 3, it did give his instruction 8. That instruction provides:

"Even though a broker is involved in the negotiations for the

---

[5] Plaintiff's Instruction 11 reads in part, as follows:

"If a buyer knowingly permits a person to attempt to arrange for a purchase of property for him or his interests, and if the buyer knows the person is a real estate broker, the real estate broker is entitled to be paid by the buyer if he (the broker) is the procuring cause of a sale of the property, even though the buyer never expressly agreed to pay the real estate broker. Under such circumstances there is an implied contract by the buyer to pay the broker."

[6] Plaintiff's Instruction 18 reads in part, as follows:

"The plaintiff has the burden of proving each of the following propositions in connection with his claim against defendant Samuel Schulman:

First, that defendant Samuel Schulman knowingly permitted the plaintiff to attempt to arrange a purchase of the La Salle Hotel, with knowledge that the plaintiff was a real estate broker; and,

Second, that the plaintiff was the procuring cause of the sale, in one of the ways explained to you in these instructions.

If you find from your consideration of the evidence that each of these propositions has been proved, then your verdict should be for the plaintiff and against the defendant Samuel Schulman * * *."

[7] Schulman's Instruction 3 reads in part, as follows:

"As to the defendant Schulman, plaintiff has the burden of proving each of the following propositions:

First, that in September, 1964, the defendant Schulman employed plaintiff to act as his broker in purchasing the La Salle Hotel;

Second, that thereafter and continuing through 1970, plaintiff acted as a broker on behalf of the defendant Schulman in negotiations for the purchase of the La Salle Hotel;

Third, that the defendant Schulman knew or should have known that plaintiff was acting as his broker in said negotiations and that plaintiff expected to be compensated by the defendant Schulman for his services;

Fourth, that plaintiff's services were the efficient and procuring cause of the sale by the defendant Brundage of his stock in the La Salle Madison Hotel Company to the defendant La Salle Hotel Company.

You are to consider these four propositions as to each defendant separately. If you find from your consideration of all the evidence that each of these propositions has been proved as to any one or more or all of the defendants, then that defendant or those defendants are liable and your verdict should be for the plaintiff and against that defendant or those defendants * * *."

purchase of property, no agreement by the purchaser to pay for the broker's services will be implied if the purchaser is justified by the circumstances in presuming that the broker is representing the prospective seller."

We believe plaintiff's instructions 11 and 18 together with this instruction and others adequately conveyed the thought expressed in Schulman's instruction 3.

Schulman next contends that his tendered instruction 10[8] should have been given to the jury. Read as a whole instruction 10 advised the jury that if it found there existed a generally known custom whereby absent an express special agreement broker's commissions are paid by the seller, the parties are presumed to have dealt with each other having reference to said custom. We believe the instruction was improper as a statement of law, for it sought to negate by custom a contract that might otherwise arise by implication. Accordingly, the court properly refused the instruction.

Schulman further contends that the court erred in giving plaintiff's instruction 12[9] and refusing his tendered instruction 2.[10] The thrust of

---

[8] Schulman's Instruction 10 reads as follows:
"In the absence of express contrary agreement, persons engaged in a business are presumed to have contracted with reference to the customs and usages of that business.

Therefore, if you find that there existed a generally known custom and usage in the real estate business in the Chicago area that in the absence of special agreement broker's commissions due on the sale of real estate, if any, are paid by the seller, then you may consider that the parties are presumed to have dealt with each other having reference to such custom and usage."

[9] Plaintiff's Instruction 12 reads, as follows:
"A broker is deemed to be the procuring cause of a sale, and he is entitled to be paid, if he was instrumental in bringing the buyer and seller together and if a sale was thereafter made by the seller to the buyer as a result thereof. Under such circumstances, the real estate broker is entitled to be paid even though other persons may have participated in the negotiations, and even though negotiations may have been conducted by the buyer and seller at which the broker was not present, and even though the sale was made without the broker's being present or without his knowledge.

A real estate broker is also deemed to be the procuring cause of a sale of property where he conducts negotiations which result in the sale. If the real estate broker conducts such negotiations, he is deemed to be the procuring cause of the sale, and he is entitled to be paid.

It is not necessary that the broker do both of these things in order to be the procuring cause of the sale."

[10] Schulman's Revised Instruction 2 reads as follows:
"When I use the expression 'procuring cause' I mean the cause which originates a series of events which, without break in continuity, result in the accomplishment of the broker's employment."

his argument is that instruction 12 constitutes an incomplete statement of law, for it states that plaintiff is entitled to be paid if he be the procuring cause of the sale. Schulman emphasizes that plaintiff also must prove the existence of an implied contract.

Again we reiterate that each jury instruction must be evaluated in context with all others, and upon review of the record, we believe Schulman's objections are not well taken. While instruction 12 is not by itself a complete statement of the law, we note that the jury instructions as a whole are permeated with the concept that recovery must be based upon a contract, either express or implied. Nor are we persuaded by Schulman's argument that instruction 10 is inadequate as a definition of "procuring cause." The instruction sufficiently conveyed the concept of causal connection between the broker's activity and the sale.

■■ Finally, Schulman contends that the court erred in giving plaintiff's instructions 10,[11] 20[12] and 21,[13] and in refusing his tendered instruction 6.[14] Schulman's argument focuses on the language of instruction 21 which reads in part:

> "Where parties have not expressly agreed on the amount of the broker's payment, the broker is entitled to the reasonable and fair payment for sales * * * in connection with which he claims payment * * *."

He argues that as per instruction 21, plaintiff need not prove an implied

---

[11] Plaintiff's Instruction 10 reads, as follows:
"A real estate broker may be entitled to payment even though he has no written agreement with the buyer or the seller to pay it. A claim by a real estate broker for a payment may be based on an implied contract."

[12] Plaintiff's Instruction 20 reads, as follows:
"If you decide for the plaintiff and against a particular defendant or both defendants on the question of liability, then you must fix the amount of damages to be awarded to the plaintiff against that defendant or defendants; that is, the amount of money to be awarded to the plaintiff as payment due from that defendant or those defendants."

[13] Plaintiff's Instruction 21 reads, as follows:
"Where parties have not expressly agreed on the amount of the broker's payment, the broker is entitled to the reasonable and fair payment for sales at the time and the place of the sale in connection with which he claims payment. If you find that the plaintiff is entitled to payment from a particular defendant, it is for you to determine from the evidence presented to you the amount of reasonable and fair payment."

[14] Schulman's tendered Instruction 6, reads:
"If you decide for the plaintiff on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate him for the fair value of his services proved by the evidence.
What the evidence has proved as the fair value of plaintiff's services is for you to determine."

agreement. He further contends that the instructions unduly emphasize a broker's right to payment.

We have considered Schulman's objections carefully and find them to be without merit. A fair reading of the instructions as a whole convinces us that they adequately informed the jury of the legal principles governing the case. Moreover, we note that any error arising out of the language of instruction 21 is rendered harmless in view of the jury's express finding that an implied contract existed between Schulman and plaintiff.

For the foregoing reasons the judgment of the circuit court is affirmed.

Affirmed.

JOHNSON, P. J., and DIERINGER, J., concur.