MAXWELL E. THORNE, Plaintiff-Appellee and Cross-Appellant, *v.* ELBERT F. ELMORE *et al.*, Defendants-Appellants.—(ELBERT F. ELMORE, Defendant-Appellant and Cross-Appellee.)

First District (5th Division) No. 78-124

Opinion filed November 2, 1979.—Supplemental opinion filed on denial of rehearing January 11, 1980.

Elmore, Gowen & DeMichael, P. C., of Midlothian (Joseph J. DeMichael, of counsel), for appellant Elbert F. Elmore.

Kenneth S. Rosenblum, of Chicago (James A. Smith, of counsel), for appellants Midlothian Motors, Inc. and Midlothian Real Estate Corporation.

Miller and Concannon, of Chicago, for appellee.

Mr. JUSTICE MEJDA delivered the opinion of the court:

This is an appeal from a judgment entered on a jury verdict awarding plaintiff, Maxwell E. Thorne, a licensed real estate broker, $50,000 in broker's commission in the sale and exchange of property owned by defendants, Midlothian Real Estate Corporation and Midlothian Motors, Inc. The action was originally brought against the two corporate defendants, John W. O'Donnell, now deceased, who controlled the corporations, and Elbert F. Elmore, who was O'Donnell's attorney and is also a

licensed real estate broker. O'Donnell's estate was substituted as a party prior to trial, and the trial court directed a verdict in its favor at the close of the evidence. The trial court also granted directed verdicts in Elmore's favor on two counts in which Thorne had alleged Elmore's tortious interference with contractual and business relationships. The jury rendered a verdict of $17,000 against Elmore and $16,500 against each corporate defendant, and Elmore and the corporate defendants have appealed from the judgment entered on that verdict. Thorne has cross-appealed from the directed verdicts granted Elmore on the two tortious interference counts.

On appeal, Elmore contends that (1) a purchaser of real estate is not liable for a brokerage commission in the absence of a special agreement; (2) the complaint was insufficient as a matter of law to provide a basis for liability for commissions; (3) Thorne did not establish a prima facie case against Elmore; (4) the judgment against him is contrary to the evidence; (5) the damages awarded by the jury have no basis in the record; (6) the admission of Thorne's exhibit No. 43 into evidence was prejudicial; (7) Elmore was prejudiced by Thorne's closing arguments; and (8) the jury was improperly instructed. The corporate defendants have also raised issues regarding: (1) whether the judgment is against the manifest weight of the evidence; (2) whether the amount awarded Thorne is unsupported by the evidence; and (3) whether conduct of Thorne's counsel was prejudicial. In his cross-appeal, Thorne contends that there are distinct causes of action for interference with a contractual relationship and interference with a business expectancy, and that he established a prima facie case against Elmore as to both causes of action.

We find for the defendants on both the appeal and cross-appeal. The pertinent facts follow.

O'Donnell had formed Midlothian Motors and Midlothian Real Estate, being president and holding a controlling interest in both corporations. Midlothian Motors owned a parcel of land on which Royal Chrysler was located. Midlothian Real Estate owned Muncaster Dodge. (The corporate defendants will hereinafter be referred to, respectively, as "Royal" and "Muncaster.") Royal and Muncaster were located on the same city block in Midlothian, Illinois. Elmore had a long-standing relationship with O'Donnell and had represented O'Donnell when he acquired Muncaster and Royal.

Thorne was a real estate broker who was in the business of discovering and selling tax shelter investments. He had had no business dealings with O'Donnell before September 1971, when he was referred to O'Donnell by a third party. After contacting O'Donnell three times by phone, a meeting was set for November 9, 1971, at O'Donnell's office at Jack O'Donnell Chevrolet. The meeting lasted about an hour and David

Evans and Robert Schuler, corporate officers at the time, were in attendance. Both Evans and Schuler were called to testify on Thorne's behalf. Evans stated that he met Thorne only once when Thorne came to O'Donnell's office. After being introduced to Thorne, Evans left the meeting. He saw Thorne at O'Donnell's office two or three other times but never spoke to him. Schuler also testified that he met Thorne only once, at a November 1971 meeting in O'Donnell's office. He said it was "very likely" that O'Donnell was also present. The sale of Muncaster and Royal were discussed at the meeting, although to his knowledge they weren't for sale before the meeting. He never saw Thorne in O'Donnell's presence after that meeting.

Objections to Thorne's testimony as to what transpired at the November 9, 1971, meeting were sustained because of O'Donnell's death. Thorne made an offer of proof that, in the presence of Schuler and Evans, O'Donnell indicated to Thorne that he was interested in Thorne's proposal to sell Muncaster and Royal. According to Thorne's offer of proof, the November 9, 1971, meeting was to discuss mortgages, notes and leases on Muncaster and Royal, which Thorne had asked O'Donnell to have ready. Thorne said he would study the documents and propose a deal.

Thorne's next meeting with O'Donnell was on November 23, 1971. No one else was present and no testimony of the meeting was admitted. Following the meeting Thorne drafted two agreements which would make him O'Donnell's exclusive agent for the sale of the Muncaster and Royal properties. Thorne took the proposed agreements to O'Donnell on December 1, 1971, then took the still unsigned documents to Elmore the same day. It was the first meeting between Thorne and Elmore, who had had a long-standing social relationship with O'Donnell in addition to being his attorney. The unsigned agreements were left with Elmore and, according to Elmore, were never discussed again.

According to Thorne's testimony, he told Elmore at their first meeting that he would be selling Muncaster and Royal for O'Donnell for which he would receive a commission of $25,000 for each parcel. Elmore, however, testified that he informed Thorne that neither property could be sold outright because of tax considerations and referred Thorne to O'Donnell's accountant. At the time of the meeting, Elmore stated, he was aware that Thorne had an exclusive listing agreement to sell a parcel of land for William F. Butler, and Thorne and Elmore discussed the possibility of trading Muncaster and Royal for the Butler property. Thorne testified that he had entered into the exclusive agreement with Butler on November 26, 1971.

Thorne also testified that he and Elmore next met on December 8, 1971. It was a long meeting, beginning at Elmore's office and continuing at

lunch. During the meeting O'Donnell's property was discussed in detail, and Elmore expressed an interest in it. Thorne and Elmore also discussed Thorne's business in general, as well as potential investors that Elmore knew. The Butler property was also discussed.

His next meeting with Elmore, Thorne continued, was on December 11, 1971, when Elmore presented a contract with several contingencies, making an offer for the Butler property and saying that he would also be willing to buy Royal. Elmore told Thorne that he should go ahead and sell Muncaster, that Elmore would act as the escrow agent in the purchase and exchange of property, and that Thorne should not worry about his commission.

According to Elmore, the next meeting after December 1 was on December 11, 1971. The meeting began in his office and extended through lunch. At the meeting Elmore submitted the contract for the purchase of Butler's property which he had prepared following the first meeting with Thorne. Thorne asked Elmore about the proposed exclusives with O'Donnell for Royal and Muncaster and Elmore repeated that they weren't signed and couldn't be signed.

Thorne and Elmore signed a memorandum of the December 11, 1971, meeting which outlined the transaction by which Butler would receive $400,000 cash for his 8.9-acre tract; O'Donnell would receive Butler's property in exchange for Muncaster, Royal and $150,000; Elmore would pay $200,000 for Royal; and Thorne would sell O'Donnell's Muncaster property for a net of $50,000. The agreement was also subject to several contingencies. The transaction was never consummated. Butler was seeking $445,000 for his property and, although Thorne informed Elmore that Butler's property was 8.03 acres, smaller than had originally been represented, he added that Butler would not lower his price and sign the contract.

A second transaction involving the same properties was proposed, and a contract was signed by Elmore and Butler on December 22, 1971. The contract provided that Elmore would purchase Butler's 8.03 acres for $445,000, contingent upon zoning and building permit requirements, approval of General Motors and Elmore's ability to trade the Butler property "for two equities in properties located in Midlothian, Illinois" plus $150,000. Thorne testified that, in addition to the $22,500 commission he was to receive from Butler pursuant to their exclusive agreement, he was to receive a total of $50,000 commission for the sale of Muncaster and Royal. Elmore testified that, in putting the second package together, he had told Thorne there would be no commission on the Muncaster and Royal properties.

O'Donnell agreed to the proposed trade of properties on January 14, 1972, but the second proposed deal with Butler also failed to come to

fruition. A survey of the Butler property, made in mid-February, disclosed that the parcel was 6.9 acres rather than the 8.03 acres contained in the contract.

On March 31 and April 1, 1972, Elmore and O'Donnell consummated a deal whereby O'Donnell received a 10-acre parcel of land in Orland Park and $200,000. A limited partnership formed by Elmore, with Elmore as general partner, acquired Royal and Muncaster. Neither Thorne nor Butler was involved in the ultimate transaction.

When Elmore did not pay Thorne the $50,000 commission, Thorne brought this action against Elmore, O'Donnell, Muncaster and Royal. After O'Donnell's estate was dismissed from the case, the jury returned verdicts of $17,000 against Elmore and $16,500 against each corporate defendant. Judgment was entered on the verdicts and the three remaining defendants appealed. Thorne filed a cross-appeal challenging the dismissal of his claim against Elmore based on interference with a contract and a business expectation.

OPINION

I.

The judgment against Elmore is based only on count VI of the first amended complaint which alleges, *inter alia*, that all of the defendants had agreed to pay Thorne's commission for the sale of the Muncaster and Royal properties. The agreement was allegedly an oral one, the terms of which were set forth in the unsigned exclusive brokerage agreements which were attached to the complaint. The judgments against the corporate defendants are based on count VI and count I, which allege the same oral agreement to pay Thorne's commission but only as to O'Donnell, Muncaster and Royal.

A.

■■ Elmore first contends that he cannot be held liable for the broker's commission absent a special agreement because Thorne's claim against him is predicated on Elmore's status as a buyer of Muncaster and Royal. Relying on the leading case of *Cole v. Brundage* (1976), 36 Ill. App. 3d 782, 344 N.E.2d 583, Elmore maintains that such an agreement may not be implied. We disagree. In *Cole*, both the seller and purchaser of a hotel were found to have agreed to pay the plaintiff-broker's commission, although the agreement had not been committed to writing. With regard to the buyer's liability, the court specifically stated:

> "We believe that plaintiff and Schulman [buyer] had an implied oral special agreement to pay the former a commission if he were successful in negotiating the sale of the hotel." (36 Ill. App. 3d 782, 795, 344 N.E.2d 583, 594.)

Similarly, the court found that an implied brokerage agreement existed between the seller and the broker. (36 Ill. App. 3d 782, 790, 344 N.E.2d 583, 592.) Clearly, then, under the holding in *Cole*, both the buyer and the seller may be held liable for a broker's commission on the basis of an implied agreement.

Elmore also contends that the complaint was insufficient as a matter of law because it contained conclusory rather than factual allegations. This objection was first raised after Elmore had filed his answer and gone to trial and is therefore waived. Ill. Rev. Stat. 1977, ch. 110, par. 42(3); *Pathman Construction Co. v. Hi-way Electric Co.* (1978), 65 Ill. App. 3d 480, 382 N.E.2d 453.

## B.

Both Elmore and the corporate defendants contend that the jury's verdict against them is contrary to the evidence. In response, Thorne contends that all three defendants have waived the issue for review, maintaining that Thorne's post-trial motion lacked specificity and that the corporate defendants have applied an improper standard in seeking review.

Among the grounds for relief in Elmore's post-trial motion were the allegations that the verdict was against the manifest weight of the evidence, that the complaint and evidence cannot and do not support the jury's verdict and the judgment for Thorne, and that the court should have directed a finding in favor of Elmore. The post-trial motion sought relief in the alternative forms of an arrest of judgment, the entry of judgment notwithstanding the verdict, the vacature of the judgment or the granting of a new trial. The notice of appeal seeks like relief. In arguing the waiver issue, Thorne has relied on *Huff v. Illinois Central R.R. Co.* (1972), 4 Ill. App. 3d 113, 280 N.E.2d 256, in which assertions similar to those in Elmore's motion were found to be insufficient to preserve specific errors for appeal. However, the basis for finding the motion in *Huff* to be inadequate was that neither the special interrogatories nor the special verdict had been challenged. Such is not the case here, where no special interrogatories or verdicts were submitted to the jury. We thus conclude that Elmore's post-trial motion is sufficient under section 68.1 of the Civil Procedure Act (Ill. Rev. Stat. 1977, ch. 110, par. 68.1) to preserve the issues for review.

We also find the post-trial motion of the corporate defendants sufficient to allow review. Their post-trial motion alternatively sought a judgment notwithstanding the verdict or the granting of a new trial, stating specific areas in which the evidence was lacking. On appeal, the corporate defendants have contended both that the denial of judgment notwithstanding the verdict was improper and that the verdict is against

the manifest weight of the evidence, although they have sought only a new trial. We agree both with Thorne's contention that the standard for entering judgments notwithstanding the verdict is more stringent than that for granting a new trial (see *Jardine v. Rubloff* (1978), 73 Ill. 2d 31, 382 N.E.2d 232), and with his observation that the corporate defendants have combined the two theories in the argumentative headings of their brief. Nonetheless, we cannot agree that this should bar review as to the corporate defendants, for they have applied the proper principles in the substance of their argument after having properly preserved the issues for review.

We will therefore address the merits of the issues based on the sufficiency of the evidence. The standard for granting a judgment notwithstanding the verdict of the jury was set forth in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, where our supreme court stated:

> "In our judgment verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.)

In evaluating the evidence, all reasonable inferences must be made in favor of the party opposing the motion. (*Public Taxi Service, Inc. v. Barrett* (1976), 44 Ill. App. 3d 452, 357 N.E.2d 1232; *Mullen v. General Motors Corp.* (1975), 32 Ill. App. 3d 122, 336 N.E.2d 338.) The *Pedrick* rule is also to be applied in reviewing the trial court's decision on motions for directed verdicts or judgment notwithstanding the verdict. *Jardine v. Rubloff*; *Atz v. Goss* (1974), 21 Ill. App. 3d 878, 316 N.E.2d 29.

With these principles in mind, we turn now to the evidence as it pertains to the defendants.

## C.

■■ Thorne's action is based on the claim that there was an implied agreement between him and defendants for all of them to pay his commission in the sale and exchange of the Muncaster and Royal properties. No particular form of words is needed to show that such an agreement existed; rather, it must be shown that the broker acted with the consent of his principal. That consent may be written or oral, or it may be implied from the acts of the parties. See, *e.g., Van C. Argiris Co. v. Caine Steel Co.* (1974), 20 Ill. App. 3d 315, 323, 314 N.E.2d 361, 367.

Thorne seeks his commission from the corporate defendants as the sellers of the Muncaster and Royal properties. The corporate defendants may be held liable for the commission: (1) if they had an exclusive agency

agreement with Thorne and the property was sold while the agreement was in effect (*Bolger v. Danley Lumber Co.* (1979), 77 Ill. App. 3d 207, 395 N.E.2d 1066; (2) if Thorne produced a buyer who was ready, willing and able to meet defendants' terms (*Ellis Realty v. Chapelski* (1975), 28 Ill. App. 3d 1008, 1011, 329 N.E.2d 370, 373); or (3) if the sale was procured or effected through Thorne's efforts. *Van C. Argiris Co. v. Caine Steel Co.* (1974), 20 Ill. App. 3d 315, 322, 314 N.E.2d 361, 366.

■■ There is no evidence which leads to the conclusion that Thorne was the exclusive agent for the two corporations. Although Thorne alleges that the terms of the agreement were the same as those in the proposed listing agreements, the agreements were never admitted into evidence and there is no oral testimony which would disclose the terms of the agreement. Furthermore, the actions of the corporate defendants and their officers are not consistent with Thorne's exclusive agency theory. Once Thorne met Elmore, it was Elmore who brought the corporations Thorne's offers regarding the Butler property. Thorne had contacted O'Donnell's accountant once and informed him of the Butler property and the possibility of an exchange of properties with O'Donnell. David Evans, the former vice-president of Muncaster, met Thorne in November 1971 and saw him two or three times after that, but their original introduction was the extent of their contact. Robert Schuler, the former secretary of both corporations, had one meeting with Thorne at O'Donnell's office in November 1971 to discuss the sale of Muncaster and Royal, but to his knowledge the two properties were not for sale before that time. Schuler had no other contact with Thorne, and he never saw Thorne with O'Donnell after the November meeting. The negotiations were conducted through Elmore and began in earnest only after Thorne had obtained an exclusive listing agreement for the Butler property. Contacts with Thorne ended after the second attempted Butler deal fell through and it was Elmore who continued attempts to put together a package involving the exchange of Muncaster and Royal.

No exclusive agency can be implied from the course of dealings between Thorne and the corporations. Thorne's contact consisted primarily of bringing offers from Butler to Elmore. Elmore relayed the information to the corporations and presented their responses and counteroffers to Thorne who passed them on to Butler. It was Elmore, not Thorne, who structured the sale and exchange by explaining to Thorne the possible use of an escrow in the transaction. The lack of direct contact with the corporations during negotiations and the end of contact after the second aborted Butler transaction show that Thorne represented only Butler.

Even assuming, *arguendo*, that there was an agreement for Thorne's exclusive agency in the sale of the Muncaster and Royal properties, and

that the terms were the same as those contained in the unsigned agreements, Thorne cannot claim his commission, for the ultimate sale and exchange of the property occurred at the end of March 1972, while, according to the documents, the exclusive agency was to run for 60 days, from December 1, 1971, to January 31, 1972.

Notwithstanding the terms of any agreement, Thorne would still be allowed to collect a commission from the corporate defendants if the sale of the property were made through his efforts. However, we find no evidence to support this theory. The transfer of the Muncaster and Royal properties that finally occurred was an exchange in which O'Donnell acquired a parcel of land in Orland Park and some cash, and Elmore's limited partnership received Muncaster and Royal. Thorne had no part in the deal. It was structured and negotiated by Elmore, the limited partnership was formed by Elmore, and the property in Orland Park was located by Elmore. It was Elmore, not Thorne, who produced a buyer who was ready, willing and able to meet O'Donnell's terms. Moreover, although it was Thorne who first made the defendants consider the sale and acquisition of the Muncaster and Royal properties, it was Elmore, not Thorne, who expended the efforts in seeing that the deal finally came to fruition. Accordingly, we conclude that the evidence cannot support Thorne's claim against the corporate defendants for his commission and the corporation's motions for judgment notwithstanding the verdict should have been granted.

### D.

We turn next to Thorne's claim against Elmore, whose limited partnership finally purchased Muncaster and Royal. The normal practice in real estate transactions is for the seller to pay the broker's commission and the buyer will be required to pay the commission only if he has specifically agreed to do so. (*Cole v. Brundage* (1976), 36 Ill. App. 3d 782, 344 N.E.2d 583; *Webster v. Hochberg* (1969), 105 Ill. App. 2d 466, 477, 245 N.E.2d 529, 535; *Wright v. McClintock* (1907), 136 Ill. App. 438.) We find no evidence that Elmore agreed to pay Thorne's commission if Elmore succeeded in acquiring the Muncaster and Royal properties.

Thorne relies principally on Elmore's statement that he would protect Thorne's commission and offers the notations of their December 11, 1971, meeting in support of his contention. The notations specifically outlined the transaction involving the Butler property but were superseded by the contract executed on December 22, 1971, by Butler and Elmore. Thorne had examined the offer and taken it to Butler for his signature. The contract provided, *inter alia*, that Thorne was the broker and that Butler was to pay him a commission of $22,500.

It cannot be inferred from this evidence that Elmore agreed to pay

the commission in the original Butler transaction. Thorne was a sophisticated broker in the business of handling tax shelter real estate investments. He had participated in all of the negotiations with Elmore until a satisfactory deal was formulated. It was not reasonable for the jury to conclude that a businessman with Thorne's experience in negotiating deals and drafting real estate contracts would have allowed a provision for his own commission to be omitted when he was one of the parties involved in ironing out the details of the transaction. It was equally unreasonable for the jury to conclude that Thorne, an experienced broker familiar with the customs and practices of his profession, would rely on an oral or implied provision for his payment when all other provisions were specifically stated in the agreement.

There being no evidence to support the conclusion that Elmore agreed to pay Thorne's commission in the original Butler transaction, it is not reasonable to conclude that Elmore agreed to pay Thorne's commission should he ever succeed in acquiring Muncaster and Royal, whether or not Thorne was involved in putting the deal together.

Thorne relies on *Cole v. Brundage* (1976), 36 Ill. App. 3d 782, 344 N.E.2d 583, the principal case in which both buyer and seller were held liable for a broker's commission, to support his claims against the three defendants. *Cole* involved the sale of the LaSalle Hotel in 1970. The plaintiff broker had first met Brundage, the owner of the hotel, in 1947 when the plaintiff had personally offered to buy the hotel from Brundage. Brundage indicated then, and on subsequent occasions, that he was willing to sell the hotel if the circumstances appeared right to him. The plaintiff had made periodic inquiries concerning the hotel, but his next personal contact with Brundage was not until the late 1950's when Brundage had quoted a sales figure to the plaintiff. The sale was never consummated, and there was no other contact in any form until 1964, when Brundage began negotiating the sale of the hotel with the ultimate buyer, Schulman. The plaintiff had known Schulman for 20 years, acting on his behalf in numerous business transactions. When Schulman expressed an interest in La Salle Street properties, the plaintiff had told him of Brundage's hotel and began negotiations. Initially, the plaintiff had relayed offers and responses between Brundage and Schulman. He arranged a meeting between Brundage, Schulman and himself after which Brundage provided Schulman with financial information about the hotel. The three met again in 1965, with Brundage's executive assistant also present. Negotiations continued into 1966 with the plaintiff as the intermediary. During the next three years no progress on the sale was made, although the plaintiff remained in contact with Schulman and Brundage's assistant. Negotiations resumed in March 1970 and after several meetings between the plaintiff, Schulman and Brundage's

assistant, Schulman asked the plaintiff if he could bring his offer to Brundage directly, telling the plaintiff not to worry about his commission because he would not sign a document without a provision for the plaintiff's commission. Schulman made the offer and a few days later the plaintiff contacted Brundage's assistant who assured him that he would be included in any future meetings. Schulman picked up his file in plaintiff's office two days later. In October 1970, Schulman told plaintiff there was no progress, but the following month, while watching a news program, the plaintiff learned of the sale of the hotel to Schulman for essentially the same terms earlier proposed.

On appeal, the court upheld a verdict against both Brundage and Schulman, noting that Brundage gave the plaintiff a preferred status in comparison to other brokers, that the plaintiff had brought the parties together and structured the ultimate sale, and that he had maintained the negotiations for a period of years. The court also pointed out that Schulman had promised to protect the plaintiff's commission.

The relationship between the parties here is vastly distinguishable from the relationship that existed in *Cole*. Thorne had no contact with O'Donnell, his corporations or Elmore until late 1971. He first met with O'Donnell in November 1971 after having had several telephone conversations with him since September. There was no continuing relationship with either the sellers or the eventual buyer as there had been in *Cole*, nor did Thorne receive any special consideration from them as had the broker in *Cole*. In contrast to *Cole*, the negotiations here were conducted through Elmore, O'Donnell's attorney, rather than through Thorne himself. Although Elmore eventually bought the property, the direct contact between him and O'Donnell while Thorne was involved was unlike the direct contact between the seller and buyer in *Cole*, where the parties were strangers to each other who relied on the broker to facilitate the contact between them. Furthermore, once the seller and buyer were in direct contact in *Cole*, the broker remained in contact with both parties or their representatives. Here, once Elmore was involved, it appears that Thorne had no more direct contact with O'Donnell or his corporate officers.

In *Cole*, the court noted the extensive evidence of a continuing broker-client relationship between the plaintiff and the buyer and added that the most convincing evidence of a special agreement for the buyer to pay his commission occurred when the buyer asked to see the seller alone to present his offer, assuring the broker that he would never sign a document without a provision for the broker's commission. The seller and buyer then signed a contract without such a provision and without the broker's knowledge. No such situation occurred here. As we stated earlier, although Elmore had agreed to protect Thorne's commission, the

agreement pertained to the Butler deal, and a provision for Thorne's commission to be paid by Butler was included in the contract which Thorne helped to negotiate and then brought to Butler for approval.

After an examination of all the evidence, we conclude that there is no evidence upon which the jury's verdict against any of the defendants could stand and the motions for judgments notwithstanding the verdicts should have been granted. Because of this conclusion, it is unnecessary for us to consider the other issues raised by Elmore and the corporate defendants.

## II.

On cross-appeal, Thorne contends that the trial court improperly directed verdicts against him on counts II and V, in which he alleged that Elmore tortiously interfered with his contractual and business relationships with O'Donnell. We disagree with Thorne's contention, after once again examining the evidence in the light of the *Pedrick* rule.

■ We have already discussed at length the evidence pertaining to the relationship between O'Donnell, his corporations and Thorne, and need only restate here that there was no agreement for Thorne's exclusive representation in the sale of Muncaster and Royal. There was therefore no contractual relationship with which Elmore could interfere. Thorne having failed to prove an essential element of his case, the verdict on count II was properly directed. *Yates v. Cummings* (1972), 4 Ill. App. 3d 899, 282 N.E.2d 261; *Franklin v. Grossinger Motor Sales, Inc.* (1970), 122 Ill. App. 2d 391, 259 N.E.2d 307, *cert. denied* (1971), 403 U.S. 911, 29 L. Ed. 2d 688, 91 S. Ct. 2207.

■ Actions for interference with the prospective economic advantage arising out of a business relationship are also recognized in Illinois and require that: (1) the plaintiff have a reasonable expectancy of entering into a business relationship; (2) the defendant knows of the expectancy; (3) the defendant intentionally interferes thus preventing the realization of the expectancy in the form of a valid business relationship; and (4) defendant's interference damages the plaintiff. (*Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.* (1974), 16 Ill. App. 3d 709, 714-15, 306 N.E.2d 549, 553, *aff'd in pt., rev'd in pt. on other grounds* (1975), 61 Ill. 2d 129, 334 N.E.2d 160.) Elmore first became aware of Thorne's potential relationship with O'Donnell and his corporations when O'Donnell sent Thorne to Elmore's office so that Elmore could review the proposed exclusive agency agreements. Elmore advised Thorne that the agreements could not be signed and Thorne did not pursue the matter much further. Nevertheless, Elmore worked with Thorne both in negotiating the transactions involving Muncaster, Royal and the Butler property and in the signing of the contract. The deal was never

consummated due to Butler's misrepresentation of the size of his property, and Thorne made no further attempts to dispose of Muncaster and Royal. Although Thorne received an offer for Muncaster in January, the offer itself was not allowed in evidence, and Thorne apparently took no further action on it when the Butler deal fell through a month later. There is no evidence of any other contacts of Thorne with any of the defendants in an attempt to sell Muncaster or Royal before the final transaction occurred on March 31 and April 1, 1972.

Taking this evidence in its aspect most favorable to Thorne, we find it impossible to see how a jury could have found in his favor on count V. The relationship was apparently abandoned by Thorne after the Butler deal collapsed. To hold Elmore liable for a breach would be to hold that, although there was no specific agreement to do so, the corporations having once unsuccessfully dealt through Thorne were not at liberty to sell their property without his involvement, in spite of his inactivity in that regard. Such a conclusion is neither reasonable nor supported by the evidence, and we therefore uphold the directed verdict on count V.

### III.

To summarize, we have followed the standard required by *Pedrick* and examined all of the evidence before us in its aspect most favorable to Thorne, making all reasonable inferences in his favor, and find that no verdict for Thorne could possibly be supported by the evidence on either his implied agreement or his tortious interference claim. Accordingly, we reverse the trial court's denial of the motions of Elmore, Muncaster and Royal for judgments notwithstanding the verdict on counts I and VI, and, pursuant to our authority under Supreme Court Rule 366(a)(5) (Ill. Rev. Stat. 1977, ch. 110A, par. 366(a)(5)), enter judgment in favor of Elmore, Muncaster and Royal. We affirm the directed verdicts against Thorne and in favor of Elmore on Counts II and V, and enter judgments thereon.

Affirmed in part; reversed in part; judgments entered.

SULLIVAN, P. J., and WILSON, J., concur.

### SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

Mr. JUSTICE MEJDA delivered the opinion of the court:

Thorne has filed a petition for rehearing. Of the points raised in his petition, only the question regarding the admissibility of the unsigned exclusive listing agreements merits further comment.

■■ The trial court refused to admit the documents into evidence on the grounds that they were "self-serving," although inadmissibility of such

documents is actually based on the hearsay rule. (McCormick, Evidence §290, at 688 (2d ed. 1972).) Thorne has cited no authority that would allow the admission of unsigned contracts as evidence of the terms of an oral agreement. In an analogous case, *Owen v. Pret' A Porter Boutique, Inc.* (1973), 15 Ill. App. 3d 438, 302 N.E.2d 672, the court held that it was error to admit into evidence a written lease signed only by the plaintiff where the original lease had expired and plaintiff sought to establish that the lease had been extended. The court reasoned that the purported lease was merely a memorandum relating to the terms of an oral contract and was not admissible because it had not been prepared and signed in defendant's presence. In the instant case, Thorne prepared the exclusives and brought them first to O'Donnell and then to Elmore. They were never signed. Therefore, they were not admissible to establish the terms of the oral agreement but could be used only to refresh the recollection of a witness. (*Owen v. Pret' A Porter Boutique, Inc.*; *Juilliard v. Friedman* (1912), 174 Ill. App. 259.) Thorne's recollection obviously needed no assistance, for he testified as to the terms of the alleged oral agreement. However, that testimony was admitted only as to Elmore and, as we stated in our original opinion, the actions of Muncaster and Royal do not support Thorne's contention that there was an implied agreement for an exclusive listing arrangement.

With regard to Elmore, all of the previous negotiations as well as the signed memorandum of December 11, 1973, were merged in the contract of December 22, 1973. That contract contained no provision that Elmore would pay Thorne's commission for the sale of the Muncaster and Royal properties. The terms cannot be altered by Thorne's testimony (*20 East Cedar Condominium Association v. Luster* (1976), 39 Ill. App. 3d 532, 349 N.E.2d 586; *Mertke v. Kracik* (1969), 122 Ill. App. 2d 347, 259 N.E.2d 328), and we can find no other evidence to support the contention that Elmore had orally or impliedly agreed to pay Thorne's commission for the sale of O'Donnell's Muncaster and Royal properties.

Accordingly, the petition for rehearing is denied.

SULLIVAN, P. J., and WILSON, J., concur.