[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
Before the court is the complaint of plaintiffs, Daniel E. Moran Sr. and Boston Nurses Association, Inc., against Norrell Health Care, Inc., for business interference and defamation. This court takes jurisdiction pursuant to G.L. 1956 (1985 Reenactment) § 8-2-14.
FACTS/TRAVEL
The defendant, Norrell Health Care, Inc., is a Georgia corporation engaged in the health care/temporary help service business. Norrell provides temporary or part-time personnel for customers in the health care field.
In order to do business in certain prescribed areas, Norrell engages agents to market in, and provide temporary employees for, those areas. In 1986, Norrell entered into an agency agreement with A.G.D.L. Associates, Inc. Anthony DiLuglio, Sr. was the president of AGDL which became Norrell's agent for the Rhode Island area.
In early 1989, Norrell was interested in opening an office in Warren, Rhode Island. AGDL was thus authorized to hire a new employee who would look into the feasibility of opening an office in Warren. Although the new employee would work for AGDL, Norrell approval was required before the new employee could be hired.
Dan Moran, the plaintiff, brought impressive credentials to his interview for the AGDL/Norrell position. He was a registered nurse in both Massachusetts and Rhode Island with 13 years of experience in the nursing field in positions ranging from staff nurse to head nurse. When Moran was interviewed for the Norrell position in March of 1989, he was the Supervisor of Nurses at the Wayland Health Center.
In mid-March, plaintiff met with A.G.D.L.'s DiLuglio, a Norrell District Manager, Kathryn Dobbs, and a Norrell Regional Manager, Cheryl Camillo. Dobbs and Camillo gave DiLuglio Norrell's approval to hire Moran as nursing supervisor for Rhode Island and manager of the new Warren office.
On the witness stand, plaintiff claimed he was offered a position by AGDL but never responded to their offer. In his deposition however, Moran indicated that he accepted the position with reservations (plaintiff's deposition, p. 15, l. 23). Cheryl Camillo testified that she considered him the manager of the Warren office.
It is unclear whether plaintiff was hired as manager of the Warren office or Director of Nursing for A.G.D.L. or both. Indeed, it is unclear whether plaintiff actually ever heard the words, "you're hired." What is undisputed is that plaintiff did some marketing for AGDL/Norrell for which he received two consultant's fees from AGDL and, at one point, performed supplemental staffing shifts for which he was paid by Norrell. The evidence and testimony also show that plaintiff, when his relationship with Norrell went sour, submitted a resignation letter to Norrell wherein he stated that he was, ". . . tenuring (sic) [his] resignation immediately with Norrell as a consultant." (Plaintiff's exhibit A)
Some time in May, 1989, a Norrell employee, Jane Leperacci, contacted Norrell in Atlanta to report certain unspecified payment problems for overtime hours at AGDL. According to Cheryl Camillo, this report prompted an audit by Norrell of AGDL in mid-May. The audit resulted in a determination by Norrell that AGDL had diverted Norrell employees and Norrell clients to another health care service business called Per Diem which was run by Anthony DiLuglio, Jr. The specifics of that controversy are the subject of a different lawsuit and irrelevant to this dispute. At any rate, Norrell perceived A.G.D.L.'s actions as a violation of their agency agreement and tried to get to the bottom of the problem at the audit. The testimony is conflicting on whether the atmosphere at the audit was merely tense or whether it actually erupted into a shouting match. Plaintiff claims he tendered his resignation on May 12th because of the unprofessional and acrimonious conduct of Norrell's representatives at the meeting. Regardless of what was said and at what volume it was said, Norrell and AGDL could not negotiate any kind of settlement so the agency agreement was terminated on May 23rd by Norrell.
On that very same day, May 23rd, plaintiff incorporated Boston Nurses Association (BNA) to compete in the business of providing temporary health care. Plaintiff arranged with Anthony DiLuglio to lease the Norrell/AGDL premises at 88 Pitman Street in Providence. As far as the testimony and evidence show, BNA existed for a very brief period of time. Plaintiffs introduced no credible evidence to show that BNA had any clientele or any commitments from prospective clientele.
Once again, there was conflicting testimony as to whether plaintiff took Norrell rolodexes and other trade secrets, or when plaintiff changed the phone number at the 88 Pitman Street address, and on when an awning with the Norrell insignia was painted over to remove the insignia. Whatever happened, Norrell sought and was granted a Temporary Restraining Order against AGDL Associates, Inc.; Per Diem Nursing Association, Inc.; Anthony DiLuglio, Sr. and Anthony DiLuglio, Jr. (Exhibit ____).
Upon being granted the TRO. Norrell wrote letters to various health care facilities around the state of Rhode Island informing them of the TRO and cautioning them against doing business with AGDL, Per Diem, the DiLuglios or any employee or agent of them. (Exhibit ____).
Norrell also sent letters to plaintiff and BNA stating that the TRO prevented Moran/BNA from soliciting business from any of the facilities listed on an exhibit attached to the TRO. Plaintiff, on advice from counsel, ceased doing business with those places and was effectively put out of business.
On July 24th, 1989, plaintiff and BNA received a clarification from Mr. Justice Needham in the form of an order saying that the May 25th TRO did not apply to plaintiff or BNA.
On August 7, 1989, plaintiff and BNA brought this cause of action against Norrell Health Care, Inc. alleging, in essence, tortious interference with a contractual relationship, interference with prospective contractual relations, and defamation. The defendant counterclaimed, alleging that Moran defamed defendant and utilized Norrell records to divert Norrell customers to BNA. This court denies defendant's counterclaim at the outset because of defendant's failure to establish any of the above allegations during the trial.
For the reasons set out below, this court also denies each of plaintiff's claims.
THE "INTERFERENCE" CLAIMS
Rhode Island recognizes a cause of action for tortious interference with a contractual relationship. The elements of the tort are: 1) the existence of a contract, 2) the alleged wrongdoer's knowledge of the contract, 3) his intentional interference with the contract and 4) damages resulting therefrom. Smith Development Corp. v. Bilow Enterprises, Inc.,308 A.2d 477, 482 (R.I. 1973).
Plaintiff and BNA allege that Norrell interfered with the contractual relationship between plaintiff and various health care providers around Rhode Island when it sent letters informing the providers of the TRO. Unfortunately, plaintiffs were never able to satisfy the first element of the tort. In order to show an interference with a contractual relationship, the plaintiff must prove the existence of a contract. Plaintiff presented no evidence that established the existence of a contract so the claim must fail.
The existence of something less than a contract does not preclude plaintiffs' claim of interference with prospective contractual relations. However, plaintiff needs more than a hope at some prospective contract to state such a claim.
In order to establish interference with prospective contractual relations, plaintiff must show the following elements: 1) the existence of a business relationship or expectancy; 2) knowledge by the interferee of the relationship or expectancy; 3) an intentional act of interference; 4) proof that the interference caused the harm sustained, and 5) damages to the plaintiff. Mesolella v. City of Providence, 508 A.2d 661, 669 (R.I. 1986).
In Mesolella, the plaintiff complained that the defendant had amended a zoning ordinance to prevent him from building a low income housing project on his land. Mesolella, 508 A.2d at 663. In anticipation of the development, and prior to the amendment of the zoning ordinance, plaintiff had submitted an application to the Rhode Island Housing and Mortgage Financing Corporation (RIHMFC) for financing his project. The project was conditionally approved by RIHMFC. Additional federal financing was sought from, and granted by, the U.S. Department of Housing and Urban Development. Id. at 664.
The Mesolella court found that the plaintiff in that case did state a claim for tortious interference with prospective contractual relations. Id. at 670. In reference to the first element of the tort (existence of a business relationship or expectancy), the Mesolella court found that plaintiff's complaint, "alleged the expectancy of a relationship with RIHMFC in the construction of his project." Id. The conditional financing approval formed the basis of this expectancy. The importance of the likelihood of the expectancy for purposes of this tort is highlighted by the causation standard provided by the Mesolella court. The court set out two options for the standard: "Courts differ in the standards they set for proof of causation in this tort. Generally, they require proof either that but for the interference there would have been a relationship or that it is reasonably probable that but for the interference the relationship would have been established." Id. at 671, citing annot., 5 A.L.R. 4th at 17.
In the case at bar, plaintiff was only able to point to a diary for a one week period purporting to record placement of certain BNA personnel in 1989 (plaintiff's exhibit 8). That is an insufficient attempt at establishing plaintiff's burden.
The Mesolella court relied on Federal Auto Body Works,Inc. v. Aetna Casualty and Surety Co., 447 A.2d 377 (R.I. 1982), to establish the tort of interference with prospective contractual relations. The Federal Auto Body court made reference to the restatement in establishing the tort. Id. 447 A.2d at 380, fn. 4 quoting Restatement (Second) Torts § 766 B at 20 (1979). That court also referred to another Restatement passage when it said, "Even if one intentionally causes a third person to abstain from entering into a contractual relationship with another, such interference is not improper if one has a financial interest in the business of the third person and merely acts to protect that interest from being prejudiced by the relation without employing wrongful means." Id. at 380.
Even if plaintiff were able to establish that he had a business expectancy with one of the health care providers, Norrell may well have been justified in sending the letters. As was mentioned though, this court finds nothing in the testimony and exhibits at trial which establish a business relationship of sufficient maturity to justify plaintiff's claim of the tort of interference with prospective contractual relations.
The plaintiff cited a California case as authority for the tort of interference with prospective economic advantage.Pacific Gas and Electric v. Bear Stearns Co., 791 P.2d 587
(Cal. 1990). That tort is California's equivalent of Rhode Island's action for interference with prospective contractual relations. As the elements of the two torts are almost identical, this court need not review in detail the defects in plaintiffs' claim. Once again, plaintiff simply has not established enough of a business expectancy to state a claim for interference with prospective economic advantage.
The California Supreme Court elaborated on this need for a definite economic relationship between the plaintiff and a third party when it said, "as a matter of law, a threshold causation requirement exists for maintaining a cause of action for either tort; namely, proof that it is reasonably probable that the lost economic advantage would have been realized but for the defendant's interference." Youst v. Largo, 43 Cal.3d 64, ___, 23 Cal.Rptr. 294, ___, 729 P.2d 728, 733 (1987).
Plaintiff also pointed to Illinois' recognition of the tort of interference with prospective economic advantage arising out of a business relationship. Thorne v. Elmore, 79 Ill. App.3d 333, 34 Ill. Dec. 846, 398 N.E.2d 837. Once again, the court required that there be some definite business expectancy. In Illinois, a plaintiff must have a, "reasonable expectancy of entering into a business relationship." Id. 398 N.E.2d at 847. No such reasonable expectancy was established by plaintiff at trial.
Plaintiff never established the existence of a business expectancy, therefore, regardless of what he calls the tort, plaintiff has not established liability on Norrell for the letters to the health care providers or for the letters to Moran and BNA under that line of authority.
DEFAMATION
Defamation requires proof of: 1) a false and defamatory statement concerning another; 2) an unprivileged publication to a third party; 3) fault amounting at least to negligence on the part of the publisher and 4) damages, unless the statement is actionable irrespective of special harm. Healey v. New EnglandNewspapers, Inc., 520 A.2d 147, 149 (R.I. 1987); Lyons v. RhodeIsland Public Employees Council 94, 516 A.2d 1339, 1342 (R.I. 1986).
Traditionally, defamation was broken down into two separate actions: libel and slander. Libel dealt with written publication of defamatory material whereas slander dealt with an oral publication. The case before this court involves both written and oral statements. In recent years, the distinction between libel and slander has been minimized but an important distinction remains. Libel is actionable without proof of special damages whereas slander requires proof of special damages unless it is slanderous per se. Laudati v. Stea, 44 R.I. 303, 117 A. 422
(1922).
"A slander is slander per se if it charges a person with a crime involving moral turpitude or states that he is suffering from certain diseases, or prejudices him in his office, profession, or business, or may probably tend to do so." Id.
Plaintiffs called, as one of their witnesses, John O'Donnell, who operated a Norrell agency in the Fall River area from 1987-1990 called Coastal Health Care Corp. O'Donnell testified that at a meeting in late 1989, Cheryl Camillo, Steve Vance and Kathryn Dobbs accused Dan Moran and BNA of illegalities. This forms the basis for plaintiffs' slander per se claim.
Plaintiffs also allege that in her September 10, 1992 deposition, Kathryn Dobbs admitted that she probably, "said that what David Moran was doing was illegal by using the Norrell time slips and the Norrell employees . . ." (Plaintiffs' exhibit no. 5, p. 33, l. 23-25).
Several problems emerge with respect to Dobbs' deposition and O'Donnell's testimony that hurt plaintiffs' reliance on them. First of all, the alleged statement made by Dobbs was in response to a hearsay statement made by Daniel Moran in his deposition:
p. 89 1. 21 Q. Kathryn Dobbs has admitted to saying exactly what?
 1. 22 A. What Daniel Moran and Boston Nurses Association was doing was illegal and conveyed that to people that went to the Norrell office.
When Moran was asked who Dobbs conveyed the message to, he identified three woman who never testified at the trial, and, as far as this court knows, never testified at any deposition. Thus, defendant has never had the opportunity to cross-examine these witnesses.
Later on in the deposition, Daniel Moran himself pointed out the danger of this allegation about Dobbs:
p. 91 1. 14 Q. To the best of your knowledge, do you know whether Cheryl Camillo made any of these alleged statements?
 A. It is just hearsay. I've been told by people, and they described who said it.
Plaintiffs failed to point out the following exchange that occurred later in Dobbs' deposition:
p. 34 1. 13 Q. The passage from Mr. Moran's deposition that I read to you, refers to an interview of you by "we", whoever he means as "we". Did that interview take place?
 1. 16 A. I don't recall any interview.
 1. 17 Q. Did you ever, and I'll quote from the passage, "admit," end quote, to saying what Mr. Moran attributes to you in his deposition?
 1. 20 Mr. Marran: Objection, already asked and answered.
 1. 22 By Mr. Prescott:
 1. 23 Q. The answer is no?
 1. 24 A. The answer is no.
Ms. Dobbs' deposition testimony is seemingly contradictory and, unfortunately, Mr. O'Donnell's testimony sheds no light on the issue. First, Mr. O'Donnell was unable to recall exactly who attended the meeting and who made the accusations of illegality. Indeed, Cheryl Camillo later denied on the witness stand that she attended the meeting with O'Donnell. Second, O'Donnell could not allege that plaintiff was accused of the commission of a specific crime, but merely that plaintiff was accused of an "illegality." Third, Mr. O'Donnell took the witness stand with a great deal of bias against Norrell. He testified that he and Norrell ended their agency relationship under less than amicable terms. He explained that he lost his life savings, "as a result of Norrell." He still believes that Norrell owes him money, although he cannot put a dollar value on it. The animus O'Donnell feels toward defendant was palpable.
For these reasons, this court does not find John O'Donnell to be a credible witness. This court is not convinced that Ms. Dobbs said that what plaintiff was doing was illegal at the 1989 meeting with O'Donnell. At most, Ms. Dobbs admitted to saying Moran was engaged in illegality. Plaintiff has presented no credible evidence to show that this potentially defamatory statement was published to a third person. Unprivileged publication to a third party is an essential element of any defamation claim. Plaintiff has not established this element.
Even if plaintiff could prove publication to O'Donnell, this court believes that Norrell was privileged to publish a suspicion of illegality to O'Donnell. John O'Donnell ran a Norrell agency. Since Norrell suspected that AGDL was diverting Norrell clients to Per Diem, they may have felt that O'Donnell deserved a warning to protect his (and Norrell's) business interests. The concept of qualified privilege allows a declarant to, "escape liability for a false and defamatory statement made about another if the occasion for the publication is such that the publisher, acting in good faith, correctly or reasonably believes that he has a legal, moral or social duty to speak out, or that to speak out is necessary to protect either his own interests, or those of third persons, or certain interests of the public." Ponticielli v.Mine Safety Appliance Co., 247 A.2d 303, 305-306 9 (R.I. 1968). Norrell may have been speaking out to protect O'Donnell's, and hence Norrell's, interests. As was mentioned, however, O'Donnell's bias calls all of his testimony against Norrell into question. This court is not persuaded that a Norrell employee or executive slandered Moran or BNA at the meeting in question.
Cheryl Camillo, who countered plaintiff's version of events on several points, was found to be knowledgeable, professional, articulate, very credible, forthright, and persuasive.
Plaintiffs' libel claim arises out of certain letters sent to Norrell customers by Norrell notifying them of the TRO. It is unclear which customers received the letter. One letter, addressed to Briarcliff Health Care, was entered as an exhibit. (Plaintiff's exhibit II).
That letter informs the Norrell customer that the TRO prohibits AGDL Associates and its employees and agents as well as Per Diem and its employees and agency from soliciting Norrell customers. No where does the letter refer to Daniel Moran or BNA. Hence, this court finds that the letter did not libel Moran or BNA expressly or by innuendo.
Norrell also sent letters to plaintiff and BNA informing them that the TRO offered to them. Assuming, arguendo, such letters contained a false and defamatory statement and Norrell was negligent in sending same, plaintiff has failed to show the essential element of publication required for a libel claim.Lorarde v. Quaranta, 205 A.2d 837, 99 R.I. 70. (R.I. 1964).
DAMAGES
Defendant claims that a distinction exists between interruption of business and destruction of business for purposes of computing damages. Although there is no Rhode Island authority to support this distinction, this court agrees with defendant that lost profits is inappropriate to a damages determination in the instant case.
As defendant concedes, lost profits is an acceptable element of damages in Rhode Island for business interruption. AbbeyMedical/Abbey Rents, Inc. v. Mignacca, 471 A.2d 189, 195 (R.I. 1984). However, recovery for loss of profits requires plaintiff to establish such loss with "reasonable certainty." SmithDevelopment Corp. v. Bilow Enterprises, 308 A.2d 477, 482 (R.I. 1973). Therefore, courts in other jurisdictions have either refused to allow recovery for lost profits for newly established businesses, Deauville Corp. v. Federated Dept. Stores, Inc.,756 F.2d 1183 C.A. 5 (Tex. 1985), Manniello v. Dea, 461 Nys.2d 582, 92 A.D.2d 426, N.Y.A.D. 3 Dept. 1983, or like Rhode Island, have required such lost profits to be shown with reasonable certainty. Walgreen Arizona Drug Co. v. Levitt, 670 F.2d 860, (A. Ariz. 1982), Masey-Ferguson, Inc. v. Santa Rosa Tractor Co.,Inc., 415 So.2d 865, Fla. App. 1 Dist. 1982, Diesel Service,Inc. v. Accessory Sales, Inc., 317 N.W.2d 719 (Neb. 1982).
In the present controversy, plaintiffs attempted to show lost profits through the testimony of an expert, Louis Paolino. For reasons that will be explained below, this court finds Mr. Paolino's testimony to be unpersuasive.
First, BNA was a new business. Therefore, pursuant to the authority cited above, plaintiff needed to show with "reasonable certainty" what BNA's profits would have been. Mr. Paolino arrived at a net annual profit figure for BNA of $182,508.00.
Mr. Paolino's opinion was based on statistics from Lifetime Medical, a supplemental staffing business that he owns. Mr. Paolino used his knowledge of Lifetime Medical, a business that had existed for 14 years, along with an assumption that plaintiff would have accomplished 600 hours per week in sales, to arrive at his profit figure.
The problems inherent in Mr. Paolino's computations are obvious. First, he was forced to assume that plaintiff and BNA would operate as efficiently as Lifetime Medical and its experienced staff. Second, he provided no basis for a figure of 600 hours of sales per week.
Paolino further assumed that BNA's average bill rate (i.e. — the bill distribution between R.N.'s, L.P.N.'s and Nurses Assistants, all of whom are paid at different rates) would be identical to Lifetime's. He relied on scheduling sheets from plaintiff and computer summary sheets from AGDL to arrive at his profit figure. The scheduling sheets were unreliable, while the AGDL computer summary sheets reflect Norrell clients, not prospective BNA clients.
The most glaring example of the speculative and unreliable nature of Mr. Paolino's testimony was his assertion that BNA would have operated well in the black in 1989 while Lifetime Medical, Paolino's own company and the basis of the comparison, sustained a significant loss. This court found Paolino's testimony speculative and unconvincing.
Generally speaking, Paolino's testimony was based upon inconclusive data, gross speculation and assumptions not in evidence. As a result of these defects, his testimony did not weather cross-examination.
For the foregoing reasons, plaintiff's claims are denied.